UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID R. STANTON,<br><br>          Petitioner,<br><br>   v.<br><br>GERALD JANDA, Warden,<br><br>          Respondent. | 1:10-cv—01481-AWI-BAM-HC<br><br>ORDER SUBSTITUTING WARDEN GERALD JANDA AS RESPONDENT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY THE PETITION FOR WRIT OF HABEAS CORPUS, ENTER JUDGMENT FOR RESPONDENT, AND DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY (Doc. 1)<br><br>**OBJECTIONS DEADLINE:**<br>**THIRTY (30) DAYS** |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304. Pending before the Court is the petition, which was filed on August 17, 2010. On April 8, 2011, Respondent served on Petitioner and filed an answer to the petition with supporting documentation. Although the time for filing a traverse has expired, Petitioner failed to file a traverse.

1

1    I.   <u>Jurisdiction</u>

2        Because the petition was filed after April 24, 1996, the

3    effective date of the Antiterrorism and Effective Death Penalty

4    Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  <u>Lindh</u>

5    <u>v. Murphy</u>, 521 U.S. 320, 327 (1997); <u>Furman v. Wood</u>, 190 F.3d

6    1002, 1004 (9th Cir. 1999).

7        A district court may entertain a petition for a writ of

8    habeas corpus by a person in custody pursuant to the judgment of

9    a state court only on the ground that the custody is in violation

10   of the Constitution, laws, or treaties of the United States.  28

11   U.S.C. §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362,

12   375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, -, 131 S.Ct. 13,

13   16 (2010) (per curiam).  Petitioner claims that in the course of

14   the proceedings resulting in his conviction, he suffered

15   violations of his constitutional rights.  Further, the challenged

16   judgment was rendered by the Tuolumne County Superior Court

17   (TCSC), which is located within the territorial jurisdiction of

18   the Eastern District of California.  28 U.S.C. §§ 84(b), 2254(a),

19   2241(a), (d).

20       Respondent filed an answer on behalf of Respondent Leland

21   McEwen as Warden of the Calipatria State Prison, Petitioner's

22   institution of confinement at the time the petition was filed.

23   Petitioner thus named as a respondent a person who had custody of

24   the Petitioner within the meaning of 28 U.S.C. § 2242 and Rule

25   2(a) of the Rules Governing Section 2254 Cases in the District

26   Courts (Habeas Rules).  <u>See</u>, <u>Stanley v. California Supreme Court</u>,

27   21 F.3d 359, 360 (9th Cir. 1994).

28       Accordingly, this Court has jurisdiction over the subject

matter of this action and over the person of Respondent.

   II.   Substitution of Respondent

   Fed. R. Civ. P. 25(d) provides that an action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending; rather, the officer's successor is automatically substituted as a party.  The rule further provides that a court may at any time order substitution, but the absence of such an order does not affect the substitution.

   Petitioner initially named as Respondent Leland McEwen, who at the time the petition was filed was the warden of Calipatria State Prison, where Petitioner has been confined at all pertinent times.  However, the official website of the California Department of Corrections and Rehabilitation (CDCR) reflects that Gerald Janda is presently acting as Warden of Calipatria State Prison.

   Accordingly, it is ORDERED that Warden Gerald Janda be substituted as Respondent.

   III.   Procedural Summary

   Petitioner's first jury trial resulted in his conviction of possession of a firearm by a felon in violation of Cal. Pen. Code § 12021(a)(1), but the jury was unable to reach a verdict on a charge of the first degree murder of Jon Flaherty in violation of Cal. Pen. Code § 187(a).   (LD 1, 2.)[1]  Shawna, Petitioner's sister, was jointly tried with Petitioner and was also convicted of possession of a firearm by a felon; further, she was convicted

_____

      [1] "LD" refers to documents lodged by Respondent in support of the petition.

3

1    of having been an accessory after the fact in violation of Cal.

2    Pen. Code § 32.  (Id.)

3         Petitioner was retried, and the jury convicted Petitioner of

4    second degree murder and having personally and intentionally

5    discharged a firearm and thereby having caused death within the

6    meaning of Cal. Pen. Code § 12022.53(d).  (Id.)  Petitioner was

7    sentenced to fifteen years to life for the murder and a

8    consecutive term of twenty-five years to life for the firearm

9    enhancement.  (Id.)

10        Petitioner appealed the judgment, and the Court of Appeal of

11   the State of California, Fifth Appellate District (CCA) affirmed

12   the judgment by a reasoned decision filed on December 10, 2009,

13   in case number F055888.  (LD 1, 52.)

14        Petitioner filed a petition for review in the California

15   Supreme Court (CSC), which was denied summarily on March 24,

16   2010, without a statement of reasoning or citation of any

17   authority.  (LD 2.)

18        IV.  <u>Factual Summary</u>

19        In a habeas proceeding brought by a person in custody

20   pursuant to a judgment of a state court, a determination of a

21   factual issue made by a state court shall be presumed to be

22   correct; the petitioner has the burden of producing clear and

23   convincing evidence to rebut the presumption of correctness.  28

24   U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48

25   (9th Cir. 2004).  This presumption applies to a statement of

26   facts drawn from a state appellate court's decision.  <u>Moses v.</u>

27   <u>Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).  The CCA stated the

28   facts in <u>People v. David R. Stanton</u>, case number F055888, filed

4

on December 10, 2009, as follows:

<u>FACTS</u>

Flaherty and his wife lived in San Andreas. Flaherty drove a Ford Ranger pickup truck, and kept a red kayak in the truck's bed. In February or March 2007, David moved into Flaherty's house.

On Friday, August 24, 2007, Flaherty and David spent the night at the residence of David's sister, Shawna. On Saturday, August 25, 2007, David and Flaherty were supposed to go to another location to repair a car for Flaherty's wife. Flaherty was wanted on an outstanding warrant and he was planning to turn himself in, but he wanted to fix the car so his wife could use it while he was in custody. David agreed to help with the car but failed to show up at their agreed meeting place on Saturday morning. Flaherty was angry, and called his wife 12 or 13 times and asked if she had heard from David.

Flaherty, David, and Shawna were acquainted with Mark Millard, who lived with his mother in a house on a large undeveloped parcel off Wards Ferry Road. Andrew O'Neill lived in a trailer that was parked on Millard's property. There were several abandoned vehciles (sic) around O'Neill's trailer, including a Chevrolet Beretta, and a second trailer that was unlocked and full of trash.

O'Neill testified that a .22-caliber semi-automatic rifle was kept in one of the unlocked cars parked by his trailer. A picture of a squirrel was carved into the rifle's stock. David and other visitors to the property occasionally used that rifle for target practice.

Sometime between 1:00 p.m. and 1:30 p.m. on August 25, 2007, David and Shawna drove up to O'Neill's trailer. O'Neill left around 2:30 p.m. and David and Shawna stayed on the property.

**The testimony of Krystal Phillips and Cassidy Coffey about the homicide**

When David failed to meet Flaherty at their appointed location, Flaherty got into his Ford Ranger truck and drove around the area to look for him. He met Krystal Phillips (Krystal) and Cassidy Coffey (Cassidy), and asked for their help to look for David.FN4 The women testified that Flaherty was angry at David for not showing up as he promised. Flaherty thought David was with Shawna. He told the women that Shawna was a big influence on David, and he wanted them to talk to Shawna so he could speak to David. Krystal and Cassidy

agreed to help and got into his truck. Krystal testified that as they were driving around, Flaherty mentioned that David had a gun but he was too much of a coward to use it.

> FN4. As we will explain *post*, Krystal and Cassidy testified at David's first trial but failed to appear for the second trial, and the court permitted the prosecution to read the entirety of their former testimony into evidence at the second trial.

Daniel Karraker lived near Millard's property. On the afternoon of August 25, Karraker briefly stopped by Millard's residence and saw David there. Around 6:00 p.m., Flaherty contacted Karraker and asked if he had seen David. Karraker replied that he had seen David at Millard's house. Karraker saw Flaherty head in that direction.

Flaherty drove to O'Neill's trailer with Krystal and Cassidy, and parked his truck in the middle of the driveway. The small Beretta hatchback was parked by the trailer. The passenger door was open and Shawna was sitting in the passenger seat. Flaherty walked up to the car and asked Shawna about David's whereabouts. Shawna said she did not know where he was. Flaherty and Shawna argued and exchanged profanities.

Krystal testified Flaherty leaned over Shawna and into the car, Shawna's voice suddenly changed as if she was choking, and Shawna started screaming that she did not know where David was. Cassidy testified that Flaherty's hands were around Shawna's throat and he was choking her. Shawna screamed at Flaherty to stop, and Flaherty accused her of lying. Cassidy never saw Shawna pass out or lose consciousness. Flaherty walked away from the car and told Shawna to get out, but she stayed inside the car.

Krystal testified Flaherty turned around as if he heard something and raised his hands. Krystal saw a man with a gun by the trailer stairs, but she did not see the gunman's face. Krystal thought the gunman or Flaherty could have said something but she was not sure. The gunman walked toward Flaherty and fired his weapon. Flaherty was still on his feet after the first shot, and stumbled and fell down into a small culvert by O'Neill's trailer. Krystal heard Flaherty say, "'Help me,'" and then she heard more gunshots after he fell down.

Cassidy testified that she heard a gunshot, looked toward the trailer, and saw David walking out with a gun. David kept walking as he fired the weapon. Cassidy

6

thought she heard four or five shots, and there was a
gap between the first shot and the subsequent shots.
Flaherty grabbed his chest and fell into the small
culvert. His back was propped up against the embankment
and his head was not on the ground. Cassidy testified
that additional shots were fired after Flaherty fell
down.

Cassidy stated that as the shots were fired, she
grabbed Krystal and they hid behind another vehicle on
the property. Both Krystal and Cassidy kept looking
over the side of the vehicle to see what was happening.
Krystal thought she heard eight or nine shots.

Cassidy testified that after the shots were fired,
David said, "'Oh, my God,'" and "'Help me, Shawna.'"
Cassidy saw David "wrestling" to put something in the
back of Flaherty's pickup truck. Krystal heard the
gunman say, "'Help me. Help me, Shawna,'" and "'Help me
put him in the truck.'"  Shawna replied, "'I'm fucking
trying.'"

Cassidy testified that Shawna went into the small
culvert where Flaherty had fallen, and she kicked the
dirt to cover up something on the ground. Krystal heard
the click from the truck's tailgate, and the gunman
told Shawna, "'Cover him with a blanket.'"  Shawna
replied, "'Okay.'"  Krystal heard another closing sound
from the truck, and the truck left very quickly. Shawna
was still kicking around the dirt in the culvert,
trying to cover up something, as the truck left.

As soon as the truck left, Shawna and Cassidy argued
about what happened, and Cassidy demanded Shawna's car
keys. Cassidy dumped out the contents of Shawna's bag
to look for the keys and several syringes fell out.
Neither Krystal nor Cassidy noticed any marks around
Shawna's neck. Krystal and Cassidy found the keys to
another car parked by the trailer but it would not
start. Shawna grabbed the syringes and drove away by
herself in the Beretta, and left the two women on the
property.

**Cross-examination of Krystal and Cassidy**

On cross-examination, Krystal and Cassidy admitted they
lied to the police when they were initially questioned
and said they did not know anything about the shooting,
the victim's true name, or what happened at O'Neill's
trailer. They admitted that they did not want to be
considered snitches or rats. Cassidy and Krystal denied
that they spoke with each other at the jail and agreed
to stick to a "script" about what to say.

Krystal admitted she previously used drugs, she had

prior felony convictions, and she was on parole at the time of the homicide. Cassidy admitted she had a prior felony conviction. At the time of their testimony, Krystal and Cassidy admitted they were in custody for failing to appear at trial.

**Millard's testimony about the homicide**

Millard testified he was in his house that afternoon, and he heard several gunshots, perhaps five or six, fired in quick succession from the direction of O'Neill's trailer. Millard called 911, ran out of his house with the telephone, and looked toward O'Neill's trailer. Millard saw David pointing and firing a rifle at another person. David walked toward the victim with a normal stride as he fired the rifle. The victim did not walk toward David, and the victim fell backwards near a creek bed. Millard testified that after he heard the five or six shots, there was a definite break of about 15 to 30 seconds, and then a final shot was fired. Millard testified David was right next to the victim in the creek bed when Millard heard the last shot, and David's hands were at a downward angle.

Millard testified the gunman was "in and out" of his field of view, but he testified that David was the gunman and that David walked forward as he fired the last shot.

Millard testified two girls were by O'Neill's trailer and they were screaming. The two girls ran toward Millard's house while he was on the telephone with the police. Millard told the girls that he was talking to the police and they should stay with him, but they ran back to the shooting scene. Millard thought Shawna was one of the girls who was running and screaming.FN5

> FN5. Krystal and Cassidy testified they ran
> to a nearby house and spoke to a man who was
> on the telephone, they told the man they
> weren't involved in the shooting, and they
> ran back to the trailer.

Millard testified that David loaded the victim's body in the back of a Ford Ranger pickup truck which had been parked by O'Neill's trailer. David covered the body with a blanket or sleeping bag. Millard saw at least one of the girls kicking dirt on the ground where the body had been. Millard testified David drove away in the truck at a fast rate of speed. No one else was in the truck. Millard thought the girls left in another car and followed the truck.

Millard admitted that he told the 911 operator that he thought O'Neill was the gunman and Karraker was

possibly driving the truck. Millard testified that things happened quickly, and he was scared and shaken when he was talking to the 911 operator. After the incident, he thought about what he saw and realized he was wrong about O'Neill and Karraker. Millard testified he did not know these people well and he had trouble putting "a face to a name" when he called 911 but he was now sure David was the gunman and the driver. Millard testified he was not influenced by newspaper accounts that David had been arrested for the homicide.

Millard acknowledged that at the first trial, he testified that he did not see the gunman firing the rifle, but now testified "[a]s I see it in my mind, I do, I did see the gun." Millard admitted he had lots of nightmares about the incident.

**The homicide scene**

Around 6:00 p.m., Tuolumne County Sheriff's Deputies arrived at Millard's property and found Cassidy and Krystal walking along the driveway. The women ignored the deputies' repeated orders to get on the ground, they were not cooperative, and they were finally placed in handcuffs and taken into custody.

A bloody suitcase had fallen out of Flaherty's truck and was on the roadway. There were bloodstains, blood drops, blood trails, drag marks, numerous footprints, multiple tire tracks, and Flaherty's broken wristwatch on the dirt near O'Neill's trailer. There were bloodstains in the culvert and embankment area, the dirt and leaves had been moved around to cover up something in that area, and there were blood stains that had been disturbed in the area next to drag marks. There were multiple shell casings on the ground.

**Cassidy's initial statement**

Deputy Philip Halencak interviewed Cassidy while she was still at O'Neill's trailer. She was angry and uncooperative. She said that she was with Krystal when they ran into an acquaintance named "Justin" at a bowling alley in Sonora. They got into Justin's small white pickup, and she thought they were going to the casino but he headed down Wards Ferry Road and stopped at a trailer. Justin walked towards the trailer while the girls stayed in the truck. Cassidy said she was still in Justin's truck when she heard several "really fast" gunshots. She pushed Krystal out of the truck, and they crouched down and hid under another vehicle that was on the property. She heard four more gunshots in a slower succession, as if someone was moving. Cassidy said she was still under the other vehicle when Justin's truck left the property. She saw a gray

vehicle leave the property about five minutes after the truck. Cassidy said she did not (sic) what happened.

Deputy Halencak testified he spoke with Cassidy for about 15 minutes, and Cassidy repeatedly said she did not want to be known as a "'rat,'" and she did not want to cooperate or identify who was involved. Cassidy never identified the gunman, and said she only heard the gunshots and did not know if anyone was shot, but she thought the victim might have been "Justin," the guy who gave them the ride. Cassidy also said that Justin argued with a woman on the property, but she did not identify the woman or say that Justin had choked that person.

**The search for the suspects**

Around 6:03 p.m., a dispatch was put out for both the pickup truck and the Beretta. Around 6:45 p.m., several officers responded to Wards Ferry Bridge, which spans a canyon and adjacent river. The officers looked around the area and watched the vehicle traffic but they did not see the truck.

Around 7:00 p.m., a crime scene technician saw the Beretta on a country road. The technician called for backup assistance and followed the Beretta until it suddenly pulled over. Shawna emerged from the driver's side and was very excited. She confronted the technician and demanded to know why she was being followed. The technician asked her to get back into the Beretta and Shawna complied. Shawna was grabbing and rubbing her neck. The technician later took photographs of Shawna, which showed scratches up and down her neck. An officer responded to Shawna's location, asked her what was going on, and Shawna burst into tears and became very upset.

Another officer later saw Shawna and testified that she had scratches down the front of her neck that were "fairly long." There was some "purpling" but no bruises. Shawna did not have any scratches or marks on the middle or back of her neck.

**Discovery of the pickup truck**

At 8:30 a.m. on Sunday, August 26, 2007, Shawna contacted the sheriff's department and reported that Flaherty's truck was in a canyon. Shawna met the deputies and directed them to the truck's exact location because it could not be seen from the road.

The deputies found Flaherty's truck below the Wards Ferry Bridge, at the bottom of the steep and rocky canyon known as Murderers' Gulch. The canyon was about

eight miles away from O'Neill's trailer, and it took about 25 to 30 minutes to drive there from the trailer. The truck plummeted 300 to 400 feet down a cliff with a slope of 45 degrees. The truck landed on a dry creek bed at the bottom of the canyon and flipped on its roof. The truck's final location was about a five-minute walk from the adjacent Tuolumne River.

A search and rescue team had to be lowered down the steep canyon to reach the truck. An officer was able to carefully walk down the canyon to the truck's location in about 10 minutes, and it took him 15 to 20 minutes to walk up the canyon and return to the road without safety rigging.

There were at least two different sets of footprints on the road at the top of the canyon. There were deceleration marks at the top edge of the canyon where the truck went over the cliff, which indicated the front tires were locked. The tire marks continued without a break from the deceleration skids and down the steep hillside, which indicated that the truck went over the cliff at a slow speed, the tires remained in contact with the surface as it went over, and it did not jump off at a high rate of speed. The truck went down in a straight direction, either because someone stayed in the truck long enough to steer it, or it was going so slow that the gravitational pull was in a straight, downward motion, and then it flipped over when it reached the bottom of the canyon.

There was debris from the truck and Flaherty's personal property scattered all the way down the steep hillside. At the bottom of the canyon, there was blood on the ground and bloody drag marks along the rocks, about 25 feet from where the truck landed. The blood did not appear to have originated from the truck, and an officer believed the drag marks began where Flaherty's body landed as the truck flipped into the canyon.

The top of the truck's passenger compartment was bent but both the driver and passenger doors were intact, latched, and closed. The truck's key was in the ignition's "on" position and the gear shift was in neutral. There was a large amount of blood in the truck's bed which was later matched to Flaherty. There was no blood in the truck's cab.

While the officers discovered Flaherty's truck, personal possessions, and bloody drag marks in the canyon, they could not find his body and could not locate David.

**David and the kayak**

11

The officers who found Flaherty's pickup truck noticed reddish-pink plastic scrapings along the rocks in the canyon, consistent with something being dragged across the rocks, but they could not identify the source.

Around 11:00 a.m. on Sunday, August 26, 2007, the sheriff's boat enforcement team launched watercraft from Mocassin Point Marina, and headed down the river to recover the truck from the base of the canyon. The deputies were in uniform and their boats were marked as being from the sheriff's department. Around 11:15 a.m., the deputies passed a man on the river in a kayak, about three-quarters of a nautical mile from the Wards Ferry Bridge. They had not received any information that the homicide suspect was associated with a kayak.

The sheriff's boat team hit a sandbar and had to turn around. Around 11:45 a.m., the deputies were returning to the marina when they saw the same man in the kayak at a different location on the river. The man did not wave at them or ask for assistance on either occasion.

Around 12:30 p.m., a clerk at the marina's snack bar noticed David was hanging around the marina. Around 1:00 p.m., David was still at the snack bar, he asked the clerk for a cigarette, and said he had been involved in a "kayaking incident" earlier that morning.

Around 3:30 p.m., another employee of the snack bar called the sheriff's department about a suspicious person. A deputy responded to the marina and asked David what he was doing. David said he was waiting for his girlfriend to pick him up. The deputy asked for his identification and David complied. The deputy recognized David's name as being wanted in Flaherty's homicide and arrested him.

The sheriff's department later found the red kayak at the marina. A deputy recognized the kayak as the one which he had seen on the river that morning. The red plastic scrapings on the canyon rocks by Flaherty's truck matched the red kayak, and Flaherty's wife identified the kayak as one that Flaherty used. The kayak contained a paddle, a polo shirt, and a pair of dark blue cargo plants. The back right leg of the pants had a rip that was at least 20 inches long.

**David's injuries**

David was wearing a red tank top, silky shorts, and tennis shoes when he was arrested at the marina. David had scrapes, abrasions, and bruises on his arms, hip, buttocks, and legs, and the deputies photographed his injuries.

An accident reconstruction specialist testified about
the type of injuries someone would have suffered if
that person was inside Flaherty's truck as it went down
the canyon. If the truck went down at full speed, an
occupant would have suffered severe and possibly fatal
injuries. If the occupant jumped out of the vehicle as
it rolled down the canyon, he would have suffered
broken bones and major injuries because of the rocky
ledge and steep descent. If the occupant remained in
the truck and was restrained by a shoulder belt, he
would have suffered deep abdominal bruises from the
belt and harness. If the occupant remained in the truck
without a seatbelt or hardness (sic), and the truck
slowly went down the cliff, he would have been tossed
around, possibly ejected, suffered major lacerations
and bruises, and might not have survived.

The accident reconstruction specialist testified that
the injuries observed on David when he was arrested at
the marina were more consistent with getting out of the
truck while it was still near the top of the incline,
as the vehicle slowly went down the steep canyon, and
he might have jumped out on the grass at the top of the
canyon before the truck hit the rocks at the bottom of
the canyon.

A pathologist examined photographs of David's
scratches, bruises, and abrasions, and testified they
were recent injuries but inconsistent with being in the
truck as it plunged to the bottom of the canyon. The
pathologist explained that a person in the truck would
have suffered severe injuries and fractures if he
stayed in the vehicle when it hit the bottom of the
canyon. The pathologist testified David's injuries
could be consistent with jumping out of the truck onto
a grassy area just as it started to go down the canyon.
David's injuries were inconsistent with jumping out of
the truck on the grassy area and then sliding down the
vertical cliff to the rocks below, because he would
have suffered cuts and scrapes on his hands as he went
down the cliff.

**Discovery of Flaherty's body**

On Tuesday, August 28, 2007, cadaver dogs found
Flaherty's body buried under a pile of rocks against
the canyon wall, about 100 feet away from the truck.
The body was completely covered by numerous rocks, and
some were so heavy that two people were needed to
remove them. Flaherty's pants had been used to drag the
body to the burial site.

Flaherty had five bullet wounds, in the head at the
right temple, the left side of his neck, the right and
left side of his chest, and left wrist. Four

.22-caliber bullets were recovered from his body. The wound in his left wrist went through his body, and was either inflicted by a fifth bullet that was not recovered, or by the same bullet which continued into his left chest or left side of his neck. The head wound was lethal, and the other wounds (except for the wrist injury) would have been lethal if not treated. It was impossible to determine the order of the shots.

The pathologist testified the trajectory of the bullet wounds was inconsistent with the victim walking towards the gunman. The gunshot wound to the right temple could have been inflicted while the victim ducked and turned his head. It was also possible that the victim was shot once or twice, fell down, and additional shots were fired while he was on the ground. Flaherty could have lived for several minutes after he was shot, he would have remained conscious and able to walk after suffering four of the five gunshot wounds, but he would have been knocked unconscious and fallen down once he was shot in the head. He still could have been alive when the truck went into the canyon. His body suffered pre-death scrape marks, consistent with being thrown from the truck and striking the rocks as the truck went down, and postdeath marks from being dragged over the rocks to the burial site at the bottom of the canyon.

Flaherty had a blood/alcohol level of .07 percent, just under the legal limit, which indicated he could have consumed a couple of drinks. He tested negative for drugs.

As the officers removed the rocks which covered Flaherty's body, they found pieces of the broken stock from a .22-caliber Marlin rifle. Another piece of the stock was found under the truck's cab. The stock had a squirrel depicted on it, and the rifle was later identified (sic) the weapon which was kept in the car by O'Neill's trailer. The rifle's barrel and magazine were found between the truck and the canyon wall. The magazine would have been able to hold 17 cartridges. There was one .22-caliber cartridge in the rifle's chamber and two unexpended cartridges in the magazine. The expended cartridges found at O'Neill's trailer were later determined to have been fired from this rifle.

<u>DEFENSE EVIDENCE</u>

**Cassidy and Krystal's prior statements**

Deputy Spencer Garrett testified that he interviewed Krystal at O'Neill's trailer about two hours after she was detained, and tried to determine the identities of the gunman and the victim. Krystal said she was on parole, she was not happy to be there, and she was not

very forthcoming when asked about what happened. Krystal said she arrived at the trailer with Cassidy and "Jon" in his truck. Jon got out but the girls stayed inside his truck. Krystal said she suddenly heard yelling and cursing, and then heard five to 10 gunshots. Krystal and Cassidy ducked down, got out of the truck, and hid behind another vehicle on the property. Krystal said she saw a man in a black shirt and pants, but she did not see the man with a gun or firing a weapon.

Detective Deborah Moss testified about her subsequent interview with Krystal, during which Krystal said that Cassidy made a comment that they needed some money, Shawna had money, and Cassidy wanted to get some from her. Krystal said that Flaherty had been upset because David and Shawna ditched him that day, but he was quiet and did not seem upset when they arrived at the trailer. Krystal said that Flaherty asked for help at some point.

Corporal Kelly Dickson testified that he interviewed Cassidy for two or three minutes at O'Neill's trailer in order to determine the identities of the suspect and the victim. She was handcuffed and in the back of a patrol car. Cassidy was very emotional and said she was shaken by what had happened. Dickson knew Cassidy from previous contacts and described her as "a very hard person" with a "very tough personality to her." Cassidy said they got a ride from a friend, who said that he had to make a quick stop at the trailer. Cassidy said that "[s]hit happened" while they were at the trailer. Cassidy said she grabbed Krystal, threw her under a vehicle on the property, they stayed under the vehicle until two other vehicles left, and then they tried to leave the area. Cassidy said a subject was shot but she did not identify the victim. Cassidy did not say that she saw the shots fired or the victim fall down.

**Flaherty's reputation for violence**

David introduced evidence that Flaherty was a violent person. Lynn Beenblossom testified that she lived at Flaherty's house and observed numerous instances where Flaherty beat and assaulted his wife, and threatened other people at the house. Flaherty frequently carried a gun, he threatened to kill his wife, and he boasted about killing and burning people and disposing of the bodies. Beenblossom became afraid of Flaherty and moved out in April 2007.

Beenblossom testified that shortly after she moved out, the police searched Flaherty's house and found weapons.FN6 Flaherty wanted Beenblossom to say the weapons belonged to her. Beenblossom admitted she owned

one of the shotguns, but she told Flaherty that she
would not lie for him in court. Beenblossom believed
that Flaherty "was coming for me" because of her
refusal to lie for him, and she kept a gun at her
house. Beenblossom testified that Flaherty was a
monster and "he was coming for me, too. And yes, I
would have shot him dead. And I would have called
9-1-1. That is the only difference, because he was
coming for me, too."

> FN6. On April 11, 2007, Flaherty's house was
> searched and officers seized a shotgun and a
> .380-caliber handgun.

Beenblossom knew David was planning to move in with
Flaherty and she told David about everything about
Flaherty because she was afraid for his safety. David
moved in anyway because he was desperate to find a
place to live so he could finish school.

Flaherty's wife testified that Flaherty frequently beat
and choked her, held her at gunpoint, and threatened to
kill her. She told David about these incidents, and
warned him that Flaherty was weird and scary when he
was on methamphetamine. David was present during some
of the assaults and tried to help her. Flaherty once
tried to choke David at the house. Flaherty's wife did
not see him with his own gun after the police seized
his weapons.

**David's trial testimony**

David testified he was convicted of grand theft when he
was 18 years old. He moved into Flaherty's house in
April 2007, and Flaherty allowed him to stay for free
in exchange for working on some cars. David was warned
about Flaherty's violent behavior but he could not
afford to live anywhere else. After David moved in, he
saw Flaherty beat his wife on several occasions, and
their children were removed by county authorities.
Flaherty attacked David when he tried to help
Flaherty's wife.

David knew the police searched Flaherty's house and
removed his weapons, but he saw Flaherty with weapons
on subsequent occasions. Flaherty blamed David for the
police search and tried to choke him.

David saw Flaherty assault and choke another person who
lived at the house, because Flaherty thought that
person was a child molester who was after his children.
Flaherty bragged about shooting people and said he was
not afraid to do it again, but David thought he was
bragging and trying to be a tough guy. David changed
his opinion after an incident when they drove out to

16

the Wards Ferry Bridge because Flaherty wanted to go
shooting. Flaherty pulled out his rifle and looked down
into the canyon, where people were rafting down the
river. Flaherty said there were people down there but
they would not be there for long, and started to shoot
at the rafters. David testified he was afraid of
Flaherty but he could not find another place to live.

David testified that on August 24, 2007, he was working
with Flaherty to repair a car at the home of Flaherty's
parents. They finished with the car around 2:00 a.m. on
August 25, 2007. Flaherty drove David to Shawna's
apartment in his pickup truck, and they spent the night
there. Around 10:00 a.m., David and Shawna left to run
errands. David told Flaherty he was leaving and he did
not know when he would return. Flaherty remained at the
apartment.

Around 2:00 p.m., David and Shawna drove to Millard's
house and stopped at O'Neill's trailer. David retrieved
the .22-caliber rifle that O'Neill kept in the unlocked
car because he was going to use it for target-shooting.
Shawna wanted to go swimming, so David left the rifle
in the second trailer on the property.

David and Shawna used the Beretta that was parked by
the trailer, and they drove to the river to go swimming
but the water was too low. Flaherty called Shawna's
cellphone, David spoke to him, and Flaherty yelled and
screamed at David that they needed to return to
Shawna's apartment. David hung up and Flaherty kept
calling, but they did not answer the calls.

Around 5:30 p.m., David and Shawna drove back to
O'Neill's trailer. O'Neill was not there and they
decided to wait for him. Just after they arrived at the
trailer, David heard the distinctive sound of
Flaherty's pickup truck on the driveway. David thought
Flaherty was mad at him, and he told Shawna to tell
Flaherty that he was not there. David went into the
second trailer to hide because he was afraid for his
safety, and he did not want to confront Flaherty or
leave with him. Shawna was sitting in the passenger
seat of the Beretta and the car door was open.

David looked out the trailer's window and saw Flaherty,
Krystal, and Cassidy get out of the truck. Flaherty
yelled and cursed at Shawna, and demanded to know where
David was. Shawna said she did not know. David
testified that Flaherty reached into the Beretta,
punched Shawna in the head, grabbed her throat, and
choked her. Shawna fell back in the car and was
screaming.

David testified that he was afraid of Flaherty but

17

decided Shawna's life was in jeopardy. He headed out of the trailer and saw the .22-caliber rifle by the door. He grabbed the rifle and intended to use (sic) "as an intimidation tool." David testified he walked out of the trailer with the gun, and Flaherty was still choking Shawna. David yelled at Flaherty to get off or leave her alone. Flaherty looked up, left Shawna at the car, and ran toward David. Flaherty's "mouth was in a snarl and everything. He was just in a full-blown run."

David believed Shawna was dead because she was not screaming anymore. He was afraid Flaherty was "going to do the same thing to me," or take away the rifle and shoot him. David had been pointing the rifle to the ground, but he raised it in Flaherty's direction and told him to stop. Flaherty did not stop. David waited until Flaherty was within four to six feet of him, and then he started shooting.

David testified he wanted to disable and not kill Flaherty. When asked if he aimed the gun at Flaherty, David testified, "[n]ot really, no." David held the rifle at waist-level and fired three shots in Flaherty's direction. Flaherty turned and moved away from David. David was afraid Flaherty was heading back to his truck to get his own gun and return fire. David raised the rifle a little higher and fired more shots. Flaherty fell into the culvert and David realized he was hit. David did not remember firing a shot into his head.

After Flaherty fell down, David lowered the rifle and freaked out. He put the rifle down by the Beretta and saw Shawna was alright (sic). He decided to take Flaherty to the hospital. He did not see any blood, but Flaherty's eyes were closed and he did not appear to be alive.

David dragged and carried Flaherty to the truck. He did not know if Flaherty was still alive and he never heard Flaherty ask for help. David asked Shawna to help him lift Flaherty into the truck but Shawna just stood there. David testified he never told Shawna to put the rifle into the truck, and she just did that on her own. David lifted Flaherty into the truck bed by himself.

As David drove away, he panicked and could not think straight. He figured Flaherty was dead and he did not want to go to prison. David drove to the Wards Ferry Bridge and just wanted to die because of what happened, and decided to drive off the cliff. He floored the truck but had "a last second change of mind" and slammed on the brakes. David stayed in the truck as it went over the cliff and bounced on the rocks. He opened the driver's door, jumped out, and hit the rocks. David

landed on his back and kept sliding down the rocky cliff. The truck went to the bottom of the canyon. When David reached the bottom, he walked to the river and tried to drown himself. He gave up and returned to the truck, and waited to see if law enforcement would arrive. Flaherty's body was lying on the rocks and it made him uncomfortable to see it. He dragged the body away from the truck and covered it up with rocks so no one would find it, and he stayed in the canyon all night.

David testified he suffered cuts and bruises, his pants were torn, and his leg and hip were hurt from falling down the rocks. He took off his damaged clothes and left on his T-shirt and boxer shorts.

David found the kayak which had been in Flaherty's truck. He put his torn clothes in the kayak and paddled out of the canyon the next morning. He passed the officers on the river and waved at them, but they did not pay attention to him. David stayed at the marina until he was arrested.

(LD 1, 3-20.)

V.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S.

362, 412 (2000).

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. at 405-06. The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002).

A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.

An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. Williams, 529 U.S. at 410. A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. In order to obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim

was "so lacking in justification that there was an error well

understood and comprehended in existing law beyond any

possibility for fairminded disagreement." Id. at 786-87.  The

standards set by § 2254(d) are "highly deferential standard[s]

for evaluating state-court rulings" which require that state

court decisions be given the benefit of the doubt, and the

Petitioner bear the burden of proof.  Cullen v. Pinholster, 131

S.Ct. at 1398.  Further, habeas relief is not appropriate unless

each ground supporting the state court decision is examined and

found to be unreasonable under the AEDPA.  Wetzel v. Lambert, -

-U.S.--, 132 S.Ct. 1195, 1199 (2012).

        In assessing under section 2254(d)(1) whether the state

court's legal conclusion was contrary to or an unreasonable

application of federal law, "review... is limited to the record

that was before the state court that adjudicated the

claim on the merits." Cullen v. Pinholster, 131 S.Ct. at 1398.

Evidence introduced in federal court has no bearing on review

pursuant to § 2254(d)(1).  Id. at 1400.  Further, 28 U.S.C.

§ 2254(e)(1) provides that in a habeas proceeding brought by a

person in custody pursuant to a judgment of a state court, a

determination of a factual issue made by a state court shall be

presumed to be correct; the petitioner has the burden of

producing clear and convincing evidence to rebut the presumption

of correctness.  A state court decision that was on the merits

and was based on a factual determination will not be overturned

on factual grounds unless it was objectively unreasonable in

light of the evidence presented in the state proceedings.

Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

The last reasoned decision of a state court must be identified in order to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1). <u>Barker v. Fleming</u>, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); <u>Bailey v. Rae</u>, 339 F.3d 1107, 1112-13 (9th Cir. 2003). Here, the CCA's decision was the last reasoned decision in which the state court adjudicated Petitioner's claims on the merits. Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). This Court will thus "look through" the unexplained decision of the CSC to the CCA's last reasoned decision as the relevant state court determination. <u>Id.</u> at 803-04; <u>Taylor v. Maddox</u>, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

VI.   Sixth Amendment Claim concerning Introduction of Krystal's and Cassidy's Prior Testimony from the First Trial

Petitioner argues that his rights to confront and cross-examine witnesses guaranteed by the Sixth and Fourteenth Amendments were violated by the admission of the prior recorded testimony of Krystal and Cassidy. The trial court found that the prosecution used due diligence to try to secure their appearance, and it permitted the prosecution to have their former testimony read into evidence. Petitioner challenges the state court's decision that the prosecution exercised due diligence to procure the attendance of Krystal and Cassidy at the second trial. Petitioner argues that the prosecution failed to employ adequate resources, including the statutory procedures of the Uniform Act to Secure the Attendance of Witnesses from without the State in

Criminal Cases (Uniform Act), to obtain Nevada subpoenas for the witnesses.

A.   Factual Summary

The facts concerning the prosecution's efforts to locate and procure the attendance of Krystal and Cassidy at the second trial were summarized in the decision of the CCA as follows:

**A. The first trial.**

On February 6, 2008, the joint jury trial for David and Shawna began before Judge DuTemple. Krystal and Cassidy were served with subpoenas to testify for the prosecution but failed to appear. On February 5 and 8, 2008, the court issued body attachments for Cassidy and Krystal. The two witnesses were arrested in San Jose, brought back to Tuolumne County, and remained in custody until they testified at the trial.

On February 14, 2008, Krystal and Cassidy testified before the jury in the first trial, and were cross-examined by the attorneys for David and Shawna. In the course of their testimony, Krystal and Cassidy admitted they were in custody for failing to appear to testify. They were released from custody after completing their testimony.

On February 27, 2008, the jury found David and Shawna guilty of being felons in possession of a firearm, and Shawna guilty of accessory after the fact. The jury was unable to reach a verdict on the murder charge against David and a mistrial was declared. David's retrial was set and repeatedly confirmed to begin on May 14, 2008.

**B. The second trial.**

On Wednesday, May 14, 2008, David's retrial for murder began before Judge Provost. As in the first trial, the prosecutor was Mr. Newkirk and David's attorney was Mr. Angermiller. The jury was selected, opening statements were given, and the prosecution's case began.

On Thursday, May 15, 2008, the jury trial continued with the prosecution's case. On that afternoon, the court conducted a hearing outside the jury's presence as to whether the prosecution could introduce the former testimony of Krystal and Cassidy from the first trial. Mr. Newkirk informed the court that Krystal and Cassidy were in Reno, they had been served with subpoenas issued in California, they had promised to meet an investigator that morning at 10:00 a.m, they

failed to appear, and they could not be found.

The court offered to issue body attachments. Mr. Newkirk replied that was not possible since the witnesses were in Nevada. The court asked Mr. Newkirk when he learned they were out of the state. Mr. Newkirk believed (sic) district attorney's investigator determined that fact on Monday, May 12, 2008.

> "THE COURT: So, you wouldn't have had time to get an out-of-state witness subpoena there and have a judge there, probably take care of it.

> "MR. NEWKIRK: Correct. And actually, we thought we had it arranged, we thought they were going to meet. I think they bought themselves some time to split."

Mr. Angermiller, David's attorney, objected to the introduction of the former testimony because David's second trial had been set for a couple of months, the district attorney's office was aware that these witnesses had the potential not to appear, and the district attorney should have obtained out-of-state subpoenas.FN7

> FN7. During the due diligence hearing, the court and parties referred to "out-of-state subpoenas," and presumably meant the subpoena procedures of the Uniform Act.

Thereafter, the court conducted an evidentiary hearing to determine if the prosecutor used due diligence to obtain the appearances of Krystal and Cassidy. Alan D'Hondt, an investigator for the district attorney's office, testified about his efforts to locate Krystal and Cassidy for the first trial in February 2008, when he went to their last known address in Tuolumne County and it was vacant. He contacted Krystal's parole officer and learned they had received a pass to stay with an aunt in San Jose. They were served with subpoenas but failed to appear. An investigator from the Santa Clara district attorney's office took the witnesses into custody in San Jose. They were returned to Tuolumne County and remained in custody until they completed their testimony at the first trial.

D'Hondt testified that on Wednesday, April 23, 2008, he received a request to locate Krystal and Cassidy for the second trial, which was scheduled to begin on Wednesday, May 14, 2008. D'Hondt admitted that based upon his experience during the first trial, he knew there was a risk that the witnesses would not cooperate. Krystal was no longer on parole and was not

required to report her address. He did not check if
Cassidy was on probation.FN8

> FN8. During D'Hondt's testimony on this
> point, the court interjected and offered to
> immediately check Cassidy's probation status.
> David's attorney replied it was a moot point,
> and the court believed that Cassidy's prior
> violations were for misdemeanor offenses.

D'Hondt testified that on Friday, April 25, 2008, he
went to the last known address of Krystal and Cassidy
in Tuolumne County to serve subpoenas and they were not
there. D'Hondt heard they returned to San Jose after
they testified at the first trial. He checked their
booking records and obtained the address for the San
Jose motel where they were arrested prior to the first
trial. Two or three days later, an investigator from
the Santa Clara district attorney's office checked the
motel and reported the manager had not seen them since
February 2008.

D'Hondt testified he next contacted the parole office,
obtained the aunt's address in San Jose, and asked the
Santa Clara investigator to contact the aunt to
determine if she had seen the girls. D'Hondt testified
that on Wednesday, May 7, Thursday, May 8, or Friday,
May 9, 2008, the Santa Clara investigator reported that
he spoke to the aunt, who said that Krystal and Cassidy
stayed with her after the first trial, but they were
stealing from her and she made them leave. The aunt
told the Santa Clara investigator: "'The last I heard,
they were talking about possibly going to Reno.'"

D'Hondt testified that when he learned the girls might
be in Reno, he looked into obtaining out-of-state
subpoenas that could be served on them. "I inquired
about it, and I was told that it would take up to 30
days."

D'Hondt testified that on Friday, May 9, 2008, he
contacted an investigator with the district attorney's
office in Washoe County, Nevada, about looking for
Krystal and Cassidy in the Reno area. The investigator
checked the criminal database and reported no contacts
with them.

D'Hondt testified that on Monday, May 12, 2008, he
checked a nationwide database and determined Cassidy
obtained a Nevada identification card with a Reno
address. D'Hondt provided the information to the Washoe
County investigator, who determined the address was a
low-end motel in downtown Reno. On the same day, the
investigator went to that motel and the manager
reported the women had moved. The investigator checked

other low rent motels in downtown Reno, and the manager of another motel positively identified them from photographs.

D'Hondt testified that at 11:00 a.m., he faxed the Tuolumne County subpoenas to the Washoe County investigator, and asked him to personally serve the witnesses at the motel and have them call D'Hondt. The subpoenas were dated for the first day of trial, Wednesday, May 14, 2008, at 8:00 a.m. D'Hondt testified the Washoe County investigator reported that he went to the motel, knocked on their room door, and both Krystal and Cassidy answered. He confirmed their identities from their photographs, served the subpoenas, and instructed them to contact D'Hondt.

D'Hondt testified that on Tuesday afternoon, May 13, 2008, both Krystal and Cassidy called him and said they were in Reno, they had the subpoenas, they did not want to get arrested again, they wanted to make arrangements to testify, but they did not have any money to return. D'Hondt tried to obtain bus tickets for them, but Greyhound would only accept passengers with photographic identifications, and one of witnesses did not have an identification card.

Around 5:00 p.m. on Tuesday, May 13, D'Hondt called the women and told them that personnel from the Tuolumne County district attorney's office would meet them in Reno, drive them to Tuolumne County to testify, and then drive them back to Reno after the trial. The women agreed to meet the investigator at 10:00 a.m. on Thursday, May 15, 2008, at a particular restaurant near their motel.

D'Hondt testified that at 10:00 a.m. that day, Thursday, May 15, the investigator arrived at the restaurant and the women were not there. He waited until 10:45 a.m. and then went to their motel. The investigator asked the motel manager if he had seen the women. The manager reported "that they were there that morning, but that they had left and they were out walking the streets." The investigator drove around downtown Reno for an hour looking for them. At 12:30 p.m., the investigator called D'Hondt and reported that he could not find them, and D'Hondt instructed him to end the search.

**C. The court's ruling**

After D'Hondt's testimony, the court found the district attorney's office used due diligence to locate Krystal and Cassidy.

"They really went above and beyond. And-and

26

> there's an additional problem, of course,
> that the two women, apparently, either were
> shining them on to get them to-to just not do
> anything and waylay their fears that Cassidy
> and Krystal would bolt, so I'm going to find
> it's due diligence."

The court found David's due process rights would not be violated by the introduction of the former testimony since Cassidy and Krystal were cross-examined at the first trial by both Mr. Angermiller and Shawna's attorney, who was "one of our better public defenders."

The court and the parties agreed that Investigator Deborah Moss would read the part of the two female witnesses before the jury. Mr. Angermiller was concerned about the impact of even having a woman read a "cold transcript" to the jury.

> "[W]ith these two particular witnesses, to
> read a cold transcript doesn't nearly tell
> the story. Because their body language and
> their manner in answering the questions is so
> telling on their credibility, I think that it
> just leaves a lot of information that's not
> on the page, you know, out of the record and
> consideration by the jury. And it's-and it's
> based, you know, if it was-if it was
> Investigator Moss, you know, it's probably
> not a big deal. But with these two particular
> witnesses, their delivery of the answers was
> so telling in terms of their credibility that
> I think this jury would lose a whole lot of
> information in terms of weighing their
> credibility."

The court acknowledged that such problems always existed when former testimony was introduced, but again found the evidence was admissible because the witnesses were unavailable and the district attorney used due diligence to attempt to secure their appearances.

The court asked Mr. Newkirk whether the trial should continue with the rest of the evidence, and they should wait until the following Wednesday, May 21, 2008, to determine if D'Hondt could find Krystal and Cassidy by then.

> "MR. NEWKIRK: Well, we'd have to do the
> out-of-state, if we can find them again.
>
> "THE COURT: Obviously, I've done those
> out-of-state subpoenas. I can't really
> imagine you could get it done. I don't think
> you could have gotten it done if you started

it last Friday, when they realized they had
gone to Reno.

"MR. NEWKIRK: But the thing is, had they been
at the restaurant and [Krystal and Cassidy]
said-simply said, we aren't going-there would
have been no authority for those officers to
 detain them [in Reno].

"THE COURT: You would have had a problem.

"MR. NEWKIRK: Yes.

"THE COURT: On Friday, when you discover on
Friday for a Wednesday trial that somebody is
missing and has moved out of state, you
can't. I can't even imagine you can get an
out-of-state witness subpoenaed for an
out-of-state time frame, you know.

"MR. NEWKIRK: Oh, yes, I have done it several
times.

"THE COURT: And I have, too. It would be hard
to imagine. I mean, you might be able, maybe,
to do it, but it wouldn't seem likely.

"MR. NEWKIRK: I agree. And if I were you
asking whether we wanted to continue their
testimony to Wednesday [May 21]-

"THE COURT: Yeah, their testimony wait until
Wednesday, see if you can do any better
getting them.

"MR. NEWKIRK: The way they were at the first
trial, and then the way they're acting now, I
think they simply bought themselves a nice
time to leave.

"THE COURT: Yeah, it sounds like it.

"MR. NEWKIRK: And find a new place to stay.
And I think we would just be spinning our
wheels until Wednesday. I anticipate
finishing my case tomorrow, probably before
noon."

Thereafter, the jury trial resumed, and the former
testimony of Krystal and Cassidy was read to the jury.

On Tuesday, May 20, 2008, the court held the
instructional conference and reviewed the appropriate
instructions for the introduction of the former
testimony of Krystal and Cassidy. The following

exchange occurred:

> "MR. NEWKIRK: There were (sic) some
> information that they might have showed up
> back of the apartment where they were.

> "THE COURT: In Reno?

> "MR. NEWKIRK: Yes, many hours after.

> "THE COURT: And made themselves scarce for a
> few hours.

> "MR. NEWKIRK: I think it was more than a few
> hours, but later that night.

> "THE COURT: Gosh, okay."

On Thursday, May 22, 2008, the jury began
deliberations. On Friday, May 23, 2008, the jury
found David guilty of second degree murder.

(LD 1, 20-27.)

### B.   The CCA's Decision

The decision of the CCA on the claim is as follows:

**D. Due diligence.**

David now contends the prosecution failed to use due
diligence to procure the appearance of Krystal and
Cassidy. "The confrontation clauses of both the federal
and state Constitutions guarantee a criminal defendant
the right to confront the prosecution's witnesses.
(U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.)
That right is not absolute, however." (*People v. Cromer*
(2001) 24 Cal.4th 889, 892 (*Cromer*).) The United States
Supreme Court "recently reaffirmed the long-standing
exception that '[t]estimonial statements of witnesses
absent from trial have been admitted only where the
declarant is unavailable, and only where the defendant
has had a prior opportunity to cross-examine.'
[Citations.] Evidence Code section 1291 codifies this
traditional exception. [Citation.] When the
requirements of Evidence Code section 1291 are met,
'admitting former testimony in evidence does not
violate a defendant's right of confrontation under the
federal Constitution. [Citations.]' [Citation.]"
(*People v. Wilson* (2005) 36 Cal.4th 309, 340 (*Wilson*),
citing *Crawford v. Washington* (2004) 541 U.S. 36, 59
(*Crawford*).) FN9

> FN9. A witness's former testimony is only
> admissible if the defendant had the

1

2

3

4

5

6

7

                    opportunity to cross-examine the witness at
                    the prior hearing with an interest and motive
                    similar to that of the hearing at which the
                    testimony is admitted, a principle left
                    intact by *Crawford*. (*People v. Smith* (2003)
                    30 Cal.4th 581, 611 (*Smith*); *People v. Seijas*
                    (2005) 36 Cal.4th 291, 303.) This element is
                    not at issue in this case. David was charged
                    with first degree murder at the first trial,
                    Krystal and Cassidy were cross-examined at
                    the first trial by the defense attorneys for
                    both David and Shawna, and the same attorney
                    represented David at both trials.

8

9

10

11

12

13

14

15

16

        To establish unavailability, the proponent of the
        evidence must show the declarant is absent from the
        hearing, and that the proponent has exercised good
        faith or reasonable diligence, but has been unable to
        procure the witness's attendance by the court's
        process. (*Smith, supra*, 30 Cal.4th at pp. 609-610;
        *People v. Sanders* (1995) 11 Cal.4th 475, 522-523
        (*Sanders*).) "Under federal constitutional law, such
        testimony is admissible if the prosecution shows it
        made 'a good-faith effort' to obtain the presence of
        the witness at trial. [Citations.] California allows
        introduction of the witness's prior recorded testimony
        if the prosecution has used 'reasonable diligence'
        (often referred to as due diligence) in its
        unsuccessful efforts to locate the missing witness.
        [Citation.]" *(Cromer, supra*, 24 Cal.4th at p. 892.)

17

18

19

20

21

22

23

24

25

26

        "'What constitutes due diligence to secure the presence
        of a witness depends upon the facts of the individual
        case. [Citation.] The term is incapable of a mechanical
        definition. It has been said that the word "diligence"
        connotes persevering application, untiring efforts in
        good earnest, efforts of a substantial character.
        [Citation.] The totality of efforts of the proponent to
        achieve presence of the witness must be considered by
        the court.'" (*Sanders, supra*, 11 Cal.4th at p. 523.)
        Relevant considerations include the character of the
        proponent's affirmative efforts, whether leads were
        competently explored, whether the proponent reasonably
        believed prior to trial that the witness would appear
        willingly and therefore did not subpoena the witness
        when he or she was available, whether the search was
        timely begun, the importance of the witness's
        testimony, and whether the witness would have been
        produced if reasonable diligence had been exercised.
        (*Sanders, supra*, 11 Cal.4th at p. 523; *Cromer, supra*,
        24 Cal.4th at p. 904.)

27

28

        "The prosecution is not required 'to keep "periodic
        tabs" on every material witness in a criminal case....'
        [Citation.] Also, the prosecution is not required,

absent knowledge of a 'substantial risk that this
important witness would flee,' to 'take adequate
preventative measures' to stop the witness from
disappearing. [Citations.]" (*Wilson, supra*, 36 Cal.4th
at p. 342.) "That additional efforts might have been made
or other lines of inquiry pursued does not affect
this conclusion. [Citation.] It is enough that the
People used reasonable efforts to locate the witness."
(*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.) The
People need not pursue futile acts not likely to produce
the witness for trial. (*Smith, supra*, 30 Cal.4th at p.
611.) "'Where the record reveals,... that sustained and
substantial good faith efforts were undertaken, the
defendant's ability to suggest additional steps
(usually, as here, with the benefit of hindsight)
does not automatically render the prosecution's efforts
"unreasonable." [Citations.] The law requires only
reasonable efforts, not prescient perfection.'
[Citations.]" (*People v. Diaz* (2002) 95 Cal.App.4th 695,
706.)

The proponent of the former testimony has the burden of
showing by competent evidence that the witness is
unavailable. (*Smith, supra*, 30 Cal.4th at p. 609.) When
the facts are undisputed, a reviewing court decides the
question of due diligence independently. (*Id.* at p.
610.) A finding of witness unavailability under
Evidence Code section 240 satisfies the unavailability
requirement of *Crawford*. (*Wilson, supra*, 36 Cal.4th at
p. 347.)

The admission of former testimony in violation of a
defendant's constitutional confrontation rights is
subject to the harmless error analysis of *Chapman v.
California* (1967) 386 U.S. 18 (*Chapman*), such that an
otherwise valid conviction should not be set aside if
the reviewing court may confidently say, on the whole
record, that the constitutional error was harmless
beyond a reasonable doubt. (*People v. Geier* (2007) 41
Cal.4th 555, 608.)

In *Cromer*, the court held the prosecution failed to use
due diligence to locate the primary witness for trial.
The witness testified at the preliminary hearing and
appeared cooperative, but disappeared two weeks later.
The prosecution was aware of her disappearance but did
not attempt to locate the witness for almost six
months. On the eve of trial, the prosecution's
investigators learned the witness might be living with
her mother in San Bernardino, but no action was taken
for two days despite the urgency of the situation.
While jury selection was ongoing, the investigator
located the mother's address, traveled there and spoke
to an unidentified woman, who said the mother was not
home, and the investigator left a subpoena for the

witness. No further efforts were made to locate the
witness or her mother. (*Cromer, supra*, 24 Cal.4th at
pp. 903-904.) *Cromer* concluded the chronology of events
showed that "serious efforts to locate [the witness]
were unreasonably delayed, and investigation of
promising information was unreasonably curtailed." (*Id.*
at p. 904.)

**E. The Uniform Act.**

As explained *ante*, to establish unavailability, the
proponent must show that it has used due diligence but
has been unable to procure the witness's attendance by
the court's process. (Evid.Code, § 240, subd. (a)(5);
*Smith, supra*, 30 Cal.4th at p. 610; *Sanders, supra*, 11
Cal.4th at pp. 522-523.) The term "court's 'process'"
as used in Evidence Code section 240 "includes the
interstate processes made available by the uniform act
to states which are parties to the compact.
[Citations.]" (*People v. Masters* (1982) 134 Cal.App.3d
509, 523 (*Masters*), criticized on other grounds in
*People v. Perez* (1989) 207 Cal.App.3d 431, 436; *People
v. Joines* (1970) 11 Cal.App.3d 259, 266.)

The Uniform Act provides "a means by which prosecuting
authorities from one State can obtain an order from a
court in the State where the witness is found directing
the witness to appear in the court in the first State
to testify." (*Barber v. Page* (1968) 390 U.S. 719, 723,
fn. 4 (*Barber*); *Masters, supra*, 134 Cal.App.3d at p.
523.) As relevant to the instant case, the Uniform Act
has been adopted by both California (§ 1334 et seq.)
and Nevada (Nev.Rev.Stat., § § 174.395-174.445).
(*Vannier v. Superior Court* (1982) 32 Cal.3d 163, 169;
*Wilson v. State* (Nev.2005) 121 Nev. 345, 366 [114 P.3d
285].)

As applicable to the instant case, the Uniform Acts
(sic) provides that if a person in Nevada is a material
witness in a prosecution in California, a California
court may issue a certificate so finding. The
certificate is presented to a court in the county in
Nevada where the witness is found. (§ 1334.3, subd.
(a).; Nev.Rev.Stat., § 174.415(1).) On presentation of
the certificate, the Nevada court sets a time for
hearing and orders the witness to appear at that
hearing. (*Ibid.*) If the Nevada court determines the
witness is material and necessary, and that it will not
cause undue hardship to the witness to be compelled to
attend and testify in California, the Nevada court
issues a subpoena or summons directing the witness to
appear for the trial in California. (Nev.Rev.Stat., §
174.415(2).) If the witness fails to appear in
California as directed by the Nevada court's subpoena
or summons issued, the witness "may be punished in the

manner provided for the punishment of any witness who disobeys a subpoena issued from a court" of California. (§ 1334.3, subd. (a); Nev.Rev.Stat., § 174.415(4).)

As an alternative procedure, the California court may issue a certificate to the Nevada court which requests that the witness be taken into immediate custody in Nevada, and delivered to a California officer to assure the witness's attendance at the California trial. In such a situation, the Nevada court may, in lieu of notification of the hearing, direct the witness "be forthwith brought" before the Nevada court for a hearing. If, at the hearing, the Nevada court is satisfied of the "desirability of such custody and delivery" of the witness, the Nevada court may, in lieu of issuing a summons or subpoena, order the witness immediately taken into custody and delivered to a California officer. (§ 1334.3, subd. (a); Nev.Rev.Stat., § 174.415(3).)

A series of cases have addressed situations where the prosecution is unable to locate a witness who has left the jurisdiction and whether the prosecution was obliged to use the Uniform Act to attempt to secure the witness's attendance. In *Barber*, a witness testified at the defendant's preliminary hearing, but he was in a federal penitentiary in Texas when the defendant's trial began in Oklahoma, and the prosecution made no effort to procure the witness's presence. The trial court permitted the witness's preliminary hearing testimony to be read to the jury on the ground that the witness was unavailable to testify since he was outside the jurisdiction. (*Barber, supra*, 390 U.S. at p. 720.)

*Barber* reversed the judgment and held the defendant was deprived of his Sixth Amendment right to confrontation by the introduction of the witness's former testimony. *Barber* held that in light of the adoption of the Uniform Act by multiple states, the mere absence of a witness from the jurisdiction is insufficient to establish due diligence when the state knows of the witness's whereabouts. (*Barber, supra*, 390 U.S. at p. 724 & fn. 4.) *Barber* held that "a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as this record reveals, the sole reason why [the witness] was not present to testify in person was because the State did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly." (*Id.* at pp. 724-725.)

In *Ohio v. Roberts* (1980) 448 U.S. 56 (*Roberts*)

(overruled on other grounds in *Crawford, supra*, 541 U.S. 36), the court found the prosecution used good faith to find a witness who departed the jurisdiction soon after testifying at the preliminary hearing. Her parents informed the prosecutor that they had heard from her only once in the prior year, she was traveling outside the state, she did not disclose her whereabouts, but a social worker reported the witness filed a welfare application in San Francisco. The prosecutor issued subpoenas for the witness at her parents' home on five occasions over a period of several months. (*Roberts, supra*, at pp. 59-60.) Roberts held the prosecution established the witness's unavailability. While the prosecutor might have tried to locate the San Francisco social worker, Roberts held that "[o]ne, in hindsight, may always think of other things. Nevertheless, the great improbability that such efforts would have resulted in locating the witness ... neutralizes any intimation that a concept of reasonableness required their execution." (*Id.* at pp. 75-76.)

In *Masters*, the victim of a grocery store robbery testified at the defendant's preliminary hearing and promised to inform the prosecution if she moved. As the trial approached, the prosecutor's investigator learned the victim moved out of state, and learned she was living with her parents in Arkansas and looking for work. The investigator sent the California subpoena to law enforcement officials in Arkansas, the victim was served and she agreed to return for the trial at the prosecution's expenses. When the investigator contacted her to make the travel arrangements, the victim said she had just started a new job, her health was too poor to travel, and she would not return. (*Masters, supra*, 134 Cal.App.3d at pp. 521-522, 526.)

*Masters* held the prosecution failed to use due diligence because it knew the victim's exact whereabouts in Arkansas and should have used the Uniform Act to secure her attendance. (*Masters, supra*, 134 Cal.App.3d at p. 527.) *Masters* rejected the prosecution's argument that it reasonably relied on her belated promise her return from Arkansas. "[The victim's] grudging promise to appear preceded by one promise already broken cannot under these circumstances cause a waiver of the fundamental right of confrontation." *(Ibid.)* *Masters* acknowledged the prosecution used greater efforts than those discussed in *Roberts*, but noted that *Roberts* "contrasted the improbability of finding the witness whose whereabouts were unknown (not present here) with the prosecution's knowing where the witness was," and the victim had already frustrated the investigator's efforts in California by failing to maintain contact as she had

agreed after being subpoenaed in California. (*Masters*, at p. 527.) *Masters* held the erroneous introduction of the victim's preliminary hearing testimony at trial was not harmless under *Chapman*, since the victim was the only witness to the defendant's alleged act of robbing her particular cash register. (*Masters*, at p. 528.)

In *People v. Blackwood* (1983) 138 Cal.App.3d 939 *(Blackwood)*, the defendant was charged with attempting to escape from prison. A temporary employee of the prison testified at the preliminary hearing about the defendant's efforts to escape into his truck from a loading dock. By the time of trial, the witness no longer worked for the state, and he was with his wife on a driving tour to Alaska and Canada. The prosecution notified law enforcement authorities in Alaska and Canada and provided a description of the witness's vehicle. The witness was found in Alaska and the prosecution offered to pay his travel expenses to return. The witness refused to leave his wife and luggage, and explained they were about to board a ship for Seattle. The trial court found the witness was unavailable. (*Id.* at pp. 945-946.)

*Blackwood* held the prosecution failed to use due diligence because it knew the witness's location and failed to use the Uniform Act to obtain the witness's attendance. *(Blackwood, supra,* 138 Cal.App.3d at p. 947.)

> "It is neither an answer nor a fulfillment of the requirements of the Evidence Code to suggest, as the People do, that the prosecution was not required to obtain interstate process because most likely neither Alaska nor Washington would have issued a subpoena due to the undue hardship to [the witness]. A guess by the prosecutor, the trial court or an appellate court about what the courts of Alaska or Washington might have done if requested to issue a subpoena for [the witness] pursuant to the uniform act, simply does not satisfy the requisite showing of inability under [Evidence Code] section 240, subdivision (a)(5). The prosecution's duty was to invoke the uniform act, not to decide whether such action would be fruitful. [Citation.] "'[The] possibility of a refusal is not the equivalent of asking and receiving a rebuff.'" [Citations.]

> "To the People's alternate contention that there was not enough time to secure such process, the answer is the same. The prosecution's burden under [Evidence Code]

section 240, subdivision (a)(5) is to
demonstrate that it 'exercised reasonable
diligence but has been unable to procure [the
absent declarant's] attendance by the court's
process.' Reasonable diligence demands that
the attempt be made to secure process under
the uniform act. Only if it in fact becomes
impossible to secure the process, has the
prosecution sustained its burden. No such
showing was made." (*Id.* at p. 947, italics in
original.)

While *Blackwood* held the defendant's confrontation
rights were violated by the admission of the witness's
former testimony, it concluded the error was harmless
under *Chapman* because the absent witness was not the
only person to describe the defendant's escape.
*(Blackwood, supra*, 138 Cal.App.3d at pp. 943, 947-948.)

In *Dres v. Campoy* (9th Cir.1986) 784 F.2d 996 (*Dres*),
the defendant was charged with murder, and his
girlfriend disappeared shortly after she was subpoenaed
to testify at the preliminary hearing. She was
arrested, appeared at the preliminary hearing, and
testified that the defendant confessed to the killing.
After the hearing, the witness moved to Arizona and
lived with her mother. Prior to trial, an investigator
contacted her mother, who agreed to bring her back to
California to testify. The witness ran away from her
mother's house about three weeks before trial. The
witness's friends thought she was back in California
but the investigator could not obtain any specific
information. The court admitted her preliminary hearing
testimony and found the prosecutor used good faith
efforts to find the witness. (*Id.* at p. 998.)

*Dres* found the prosecution used good faith to locate
the witness even though it did not use the Uniform Act
to obtain the witness's appearance.

"The good faith obligation to resort to the
Uniform Act, however, arises only when the
prosecutor knows the location of the witness.
[Citations.] If the witness cannot be
located, application of the Uniform Act is
impossible. In cases in which the witness
disappears, the prosecution only has a good
faith obligation to find the witness.
[Citations.]" (*Dres, supra*, 784 F.2d at pp.
999-1000.)

*Dres* acknowledged the prosecution was aware of the
witness's precise location in Arizona for several
months, it started the paperwork to obtain a subpoena
under the Uniform Act, but it never filed the documents

36

or used the court's process under the Uniform Act. *Dres* held the prosecution's decision not to use the Uniform Act was not unreasonable under the circumstances. (*Dres*, supra, 784 F.2d at p. 1000.)

> "A tactical decision was made not to serve [the witness] with a subpoena because the prosecutor feared she might flee as she had done prior to the preliminary hearing. The prosecutor faced a dilemma under the Uniform Act because if he served [the witness] with a subpoena she might flee, yet if he failed to seek a subpoena the trial court might find that he had not made a good faith effort to obtain her testimony. The only other option available under the Uniform Act was for the prosecutor to request that [the witness] be taken into custody [under the Uniform Act]." (*Ibid.*)

*Dres* held it would not have been reasonable for the prosecution to take the witness into custody nearly a month before the trial since such a detention would have been unconstitutional. (*Dres*, *supra*, 784 F.2d at p. 1000.) The prosecution's only viable option at that point would have been to subpoena the witness, "which probably would have caused her to flee judging from her behavior before the preliminary hearing. In light of these tactical considerations, the prosecutor acted in good faith when he decided to use means other than the Uniform Act for procuring [the witness's] attendance at trial." (*Ibid.*)

*Dres* held it was reasonable for the prosecution to rely on the promise by the witness's mother that she would bring the witness back for the trial. In contrast to *Masters,* there was no reason to suspect the mother's promise would be ineffective. "The prosecution should not have to comply with the procedures of the Uniform Act when it appears that an out-of-state witness is cooperative or more likely to testify on the basis of an informal agreement than under the compulsion of a subpoena." (*Dres, supra*, 784 F.2d at p. 1001.) *Dres* noted the prosecutor in *Masters* failed to use good faith efforts once the witness stated she would not return, and failed to check numerous leads as to the witness's whereabouts, whereas "[e]very reasonable effort was made to find [the witness in *Dres*] after she disappeared." (*Dres*, at p. 1001.)

In *People v. Hamilton* (1985) 41 Cal.3d 408 (*Hamilton*) (criticized on other grounds in *People v. Hamilton* (1988) 45 Cal.3d 351, 357), a witness from Oklahoma testified at the preliminary hearing in California, maintained regular contact with the prosecutor's

investigator, was served with a subpoena for trial, and
appeared cooperative. The witness disappeared about two
weeks before trial and could not be found in Oklahoma.
Defendant argued the prosecution failed to use due
diligence because it never used the Uniform Act to
secure the witness's attendance. (*Hamilton, supra*, at
pp. 430-431.) *Hamilton* distinguished the situation from
*Blackwood* and *Masters*, because the witness had been
cooperative but unexpectedly disappeared two weeks
before trial. "Since [the witness] could not be located
after his unexpected disappearance, it would have been
pointless to have used the uniform act. [Citation.]"
(*Hamilton, supra*, at p. 431.)

In *People v. Hovey* (1988) 44 Cal.3d 543 (*Hovey*), a
witness testified at the defendant's preliminary
hearing, and investigators started to look for the
witness about a month before the trial. The witness had
been incarcerated in California and released on
interstate parole to Oklahoma. The California
investigators made various inquiries, attempted to
locate the witness's parents and relatives, and
enlisted the help of Oklahoma authorities, who assisted
by "following numerous leads, making various telephone
calls and checking arrest and drivers' license
records," but he was not found and his preliminary
hearing testimony was admitted at trial. (*Id.* at p.
562.)

*Hovey* held the prosecution had shown due diligence, and
rejected the defendant's arguments that the People
should have attempted to subpoena the witness while he
was still in California or should have "kept in
'periodic contact'" with him after his release from
California prison. (*Hovey, supra*, 44 Cal.3d at p. 563.)
*Hovey* explained that "we could not properly impose upon
the People an obligation to keep 'periodic tabs' on
every material witness in a criminal case, for the
administrative burdens of doing so would be
prohibitive. Moreover, it is unclear what effective and
reasonable controls the People could impose upon a
witness who plans to leave the state, or simply
'disappear,' long before a trial date is set.
Certainly, resort to the subpoena or 'material witness'
processes would have been premature in this case." (*Id.*
at p. 564.)

In *People v. Lopez* (1998) 64 Cal.App.4th 1122 (*Lopez*),
the prosecutor's office spoke to the victim one month
prior to trial, there was no reason to believe she
would not cooperate, and she was subpoenaed to testify
at the trial. The victim disappeared on the day of
trial. On the day of her scheduled testimony, the
investigator contacted a relative, who believed she was
living in Las Vegas. (*Id.* at pp. 1224-1225.) Although

the investigator made no effort to determine whether
she was actually living in Las Vegas, *Lopez* held the
prosecution used due diligence to attempt to secure her
appearance:

> "[T]he prosecution was not required to do
> everything possible to procure [the victim's]
> attendance; it was only required to use
> reasonable diligence. There is nothing to
> indicate that had the prosecution been able
> to verify [the victim's] Las Vegas address
> she would have returned in time to testify.
> That the reason given for [the victim's] trip
> to Las Vegas may have had nothing to do with
> the trial does not mean the prosecution could
> have obtained her timely return. Had [the
> victim] been anxious to testify, she had
> plenty of time before [the trial] to contact
> the prosecutor and make arrangements to
> appear." (*Id.* at p. 1128.) FN10

> > FN10. A closely related question is
> > currently pending before the
> > California Supreme Court in *People
> > v. Cogswell*, review granted,
> > February 13, 2008 (S158898), as to
> > whether due diligence required a
> > prosecutor to use the Uniform Act
> > to take into custody a sexual
> > assault victim who left the state
> > and refused to return to testify.

In *People v. Sandoval* (2001) 87 Cal.App.4th 1425
(*Sandoval*), a witness was in custody on drug charges,
he testified against the defendant at the preliminary
hearing, and he was deported to Mexico. Prior to trial,
the prosecution contacted the witness in Mexico, and he
was willing to testify if he could get a passport and
visa to legally enter the United States. The
prosecution declined to provide the witness with $100
so he could apply for a visa, and did nothing else to
secure his presence at trial. (*Id.* at p. 1432.)
*Sandoval* held the prosecution failed to show due
diligence, and observed that "[t]he circumstances
presented to the prosecution, including finding [the
witness], receiving from him his assurance he wanted to
cooperate, and determining that he needed funds to
comply, left the prosecution with several options.
There was a possibility, not remote, even perhaps a
likelihood, that [the witness] would attend if the
prosecution assisted him. [Citation.]" (*Id.* at pp.
1441-1442.) *Sandoval* held the prosecution "threw up its
hands" instead of pursuing any of these alternatives,
and thus failed to use due diligence. (*Id.* at p. 1443.)

**G. Analysis.**

We find the prosecution herein clearly used due
diligence when it started to look for Krystal and
Cassidy nearly three weeks before the beginning of the
second trial. In contrast to *Cromer*, the prosecution's
investigator, D'Hondt, used all possible leads to
determine the witnesses' whereabouts, the
investigator's efforts were not "unreasonably delayed,"
and the investigation of "promising information" was
not "unreasonably curtailed." (*Cromer, supra*, 24
Cal.4th at p. 904.) When Krystal and Cassidy could not
be found in Tuolumne County, D'Hondt reviewed his prior
research, found the name of the motel where they were
previously living in San Jose, and sent a Santa Clara
County investigator to look for them. They were not
there but D'Hondt was not deterred. He again retraced
his research from the first trial, learned they had an
aunt in San Jose, and sent the Santa Clara investigator
to speak to the woman. The aunt reported the witnesses
were living with her after the first trial, she threw
them out of her house because they were stealing from
her, and they talked about possibly going to Reno.
Again, D'Hondt continued the investigation as the start
of the second trial approached. He contacted an
investigator in the district attorney's office in
Washoe County, Nevada, continued to conduct his own
research, located an address for Cassidy at a Reno
motel, and sent the investigator to check it out. While
the witnesses were not at that motel, the Washoe County
investigator kept looking for them, and found them at
another Reno motel.

The prosecution herein used extraordinary efforts to
track down Krystal and Cassidy, and it began the search
in a reasonable amount of time prior to the second
trial. The investigator was not deterred by
unsuccessful leads, he continued to use all possible
efforts to locate the witnesses, and he was not
dilatory as the start of the second trial approached.

Defendant contends the prosecution had a duty to obtain
subpoenas for Krystal and Cassidy under the provisions
of the Uniform Act. We find that the prosecution did
not have such a duty based on the evolving facts and
circumstances of the case. First, the "good faith
obligation to resort to the Uniform Act ... arises only
when the prosecutor knows the location of the witness.
[Citations.]" (*Dres, supra*, 784 F.2d at p. 999.) We
have already found the prosecution's investigator used
due diligence when he began his search for Krystal and
Cassidy nearly three weeks before the scheduled trial
date. While the prosecution had obtained subpoenas from
the Tuolumne County Superior Court for the witnesses,
there is no evidence the prosecution knew of the

whereabouts of Krystal and Cassidy, or that they might have left the state, which would have triggered any type of duty to obtain and serve out-of-state subpoenas under the Uniform Act. Indeed, there was no credible evidence at that time that the witnesses were in another state. (See, e.g. *Hamilton, supra*, 41 Cal.3d at p. 431 [pointless to use Uniform Act when witness's whereabouts are unknown].)

Defendant challenges the sequence in which D'Hondt used the tools at his disposal to look for Krystal and Cassidy, and argues that D'Hondt was remiss for not taking certain steps at different times in his search. However, D'Hondt carefully and methodically used all possible leads to find them. It was reasonable for D'Hondt to begin his search at their last known address in Tuolumne County, because there is no evidence that Krystal and Cassidy were aware that David's first trial ended in a mistrial or that another trial was going to be conducted, such that they could have returned to that residence after the first trial. When D'Hondt determined the witnesses were no longer living in Tuolumne County, he carefully and methodically traced them to San Jose, and confirmed they had been living there with an aunt after the first trial. The aunt reported that she threw them out because they were stealing from her, and they talked about going to Reno, but she lacked any specific contact information as to their whereabouts.

Defendant contends the prosecution should have anticipated that Krystal and Cassidy would evade service of process based upon their actions during the first trial. However, the prosecution was not obligated to keep "'periodic tabs'" on Krystal and Cassidy after their appearances at the first trial, and "resort to the subpoena or 'material witness' processes would have been premature" under the circumstances. (*Hovey, supra*, 44 Cal.3d at p. 564.) Moreover, it would have been unreasonable for the prosecution to take the witnesses into custody nearly a month before the second trial, and such a detention would have been unconstitutional. (*Dres, supra*, 784 F.2d at p. 1000.)

As we have already explained, D'Hondt's methodical search continued as he used the resources of a Washoe County investigator to determine if Krystal and Cassidy had any contacts with law enforcement in Nevada. D'Hondt did not simply rely upon the work of that investigator but he continued to conduct his own investigation, and learned that Cassidy had obtained a Nevada identification card with the address of a Reno motel. The Washoe County investigator could not find them at the motel, continued looking in the downtown Reno area, and found them at another motel.

41

Defendant contends the prosecution should have used the Uniform Act to obtain Nevada subpoenas for Cassidy and Krystal when they were found at the Reno motel. Once the prosecution learns about a witness's whereabouts, however, it may reasonably make the tactical decision to use means other than the subpoena process of the Uniform Act to secure the witness's appearance, in order to avoid triggering the witness's reaction of fleeing. (*Dres, supra*, 784 F.2d at p. 1000.) While the aunt thought that Krystal and Cassidy might be in Reno, there was no evidence that the witnesses knew the prosecution was looking for them, David was going to be tried again, the second trial was about to begin, or they were about to be served with subpoenas to return to Tuolumne County. More importantly, however, there is absolutely no evidence they went to Reno to avoid being witnesses at David's second trial. Instead, the undisputed evidence is that they left San Jose only because of the aunt's decision to throw them out of her house because they were stealing from her. Moreover, Cassidy's decision to obtain a Nevada identification card with a valid address, and their continued presence in the immediate area of that address, further refutes any inference that they were trying to disappear or avoid service of process in this case. When the Washoe County investigator found Krystal and Cassidy at the Reno motel, he served them with the Tuolumne County subpoenas, he instructed them to call D'Hondt, and they complied with his orders. There were numerous exchanges between Krystal, Cassidy, and the investigator in the following 24 hours, as they worked out the logistics of their return to Tuolumne County. There is no evidence they were aware of the legal limitations of the Tuolumne County subpoenas. They had an opportunity to disappear, but they did not abscond and instead maintained regular contact with D'Hondt. (Cf. *Masters, supra*, 134 Cal.App.4th at p. 527 [witness's broken promise to appear plus prosecution's knowledge of witness's exact whereabouts triggered prosecution's duty to use Uniform Act]; *Blackwood, supra*, 138 Cal.App.3d at p. 947 [same].)

Under the undisputed facts and circumstances, the prosecution did not have a duty to obtain subpoenas for Krystal and Cassidy under the Uniform Act once they were found in Reno, given the cooperation of the witnesses and the reasonable belief that they were "more likely to testify on the basis of an informal agreement than under the compulsion of a subpoena." (*Dres, supra*, 784 F.2d at p. 1001.) In addition, the prosecution did not "thr[ow] up its hands" when faced with logistical problems and instead made extraordinary efforts to arrange for their return to Tuolumne County. (Cf. *Sandoval, supra*, 87 Cal.App.4th at p. 1443.)

Again, given the unique facts and circumstances of this case, there was no evidence that Krystal and Cassidy were going to evade process until the moment they failed to meet the investigator at the restaurant. Even if the prosecution's investigator arrived at that restaurant with subpoenas obtained under the Uniform Act, Krystal and Cassidy were not present to be served and their whereabouts were unknown. The prosecution was not required to obtain subpoenas under the Uniform Act after Krystal and Cassidy failed to appear at the restaurant, because it is "pointless" to use the resources of the Uniform Act where a witness cannot be located after an unexpected disappearance. (*Hamilton, supra*, 41 Cal.3d at p. 431.)

Defendant complains the prosecution gave up the search too quickly and should have used other means to look for Krystal and Cassidy in Reno and beyond. As explained in *Roberts*, however, "[o]ne, in hindsight, may always think of other things. Nevertheless, the great improbability that such efforts would have resulted in locating the witness[es], and would have led to [their] production at trial, neutralizes an intimation that a concept of reasonableness required their execution." *(Roberts, supra*, 448 U.S. at pp. 75-76.) "[T]he prosecution was not required to do everything possible to procure [the witness's] attendance; it was only required to use reasonable diligence." *(Lopez, supra*, 64 Cal.App.4th at p. 1128.)

We thus conclude the prosecution used due diligence to locate Krystal and Cassidy, there was no duty to use the Uniform Act under the facts and circumstances of this case, and the trial court herein properly admitted the witnesses' former testimony.

(LD 1, 27-43.)

C. Analysis

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." The testimonial statements of witnesses absent from trial can be admitted only where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 59 (2004). A witness is not unavailable for purposes of the confrontation

requirement unless the prosecution establishes that it has made a
good faith effort to obtain the witness's presence at trial, but
the witness remains unavailable despite resort to available
processes, such as the Uniform Act. Barber v. Page, 390 U.S.
719, 723-24 (1968); Ohio v. Roberts, 448 U.S. 56, 74 (1980),
overruled on another ground, Crawford v. Washington, 541 U.S. 36.
The extent of efforts which the prosecution must undertake to
produce a witness is a question of reasonableness. Ohio v.
Roberts, 448 U.S. at 74. Thus, where it is greatly improbable
that a particular effort would have resulted in locating a
witness and producing the witness at trial, reasonableness does
not require undertaking the effort. Id. at 76. The Sixth
Amendment does not require the prosecution to exhaust every
avenue of inquiry, such as contacting a source where there is no
reason to believe that a source has useful or superior
information about a witness's whereabouts, or issuing a subpoena
where it is not reasonably anticipated to be effective. See,
Hardy v. Cross, - U.S. -, 132 S.Ct. 490, 494 (2011) (per curiam).
Even if there is a violation of the right to confrontation,
habeas relief will not be granted unless the error had a
substantial and injurious effect or influence in determining the
jury's verdict. Jackson v. Brown, 513 F.3d 1057, 1084 (9th Cir.
2008) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Here, the state court articulated the appropriate federal
standard. Although the witnesses had not cooperated before they
testified in the first trial, there was no evidence suggesting
that the witnesses knew that there would be another trial or that
their testimony would again be needed. Further, it appeared that

1  the witnesses had stayed in the jurisdiction until their aunt

2  directed them to leave; there was no basis at any time for

3  concluding that the witnesses were currently attempting to avoid

4  testifying.  It was not unreasonable for the prosecution to begin

5  its efforts to find the witnesses several weeks before trial.

6  Likewise, at that point there was no basis for a belief that the

7  witnesses were outside the jurisdiction.

8      Petitioner argues that it was unreasonable for the

9  prosecution not to check the national database until May 12, two

10  days before the trial started; Petitioner argues that if that

11  database had been consulted earlier, better information as to the

12  witnesses' whereabouts would have been discovered sooner.

13  However, the investigators utilized local sources of information

14  that were reasonably expected to yield information concerning the

15  witnesses' whereabouts, including previous addresses, booking

16  records from the witnesses' custody during the first trial, a

17  family member with whom they had previously stayed, and a local

18  criminal database in Nevada.  The state court reasonably decided

19  that resort to these sources was not unreasonable.

20      Petitioner argues that the failure to utilize the Uniform

21  Act necessarily rendered the prosecution's efforts unreasonable.

22  The Court is aware of no authority from the Supreme Court which

23  requires utilization of the Uniform Act in every case.  Here,

24  even after reasonable efforts were undertaken, it was not

25  discovered that the witnesses were outside California until two

26  days before the trial commenced.  Although Petitioner argues that

27  the prosecutor admitted to the trial court that he could have

28  obtained the witnesses' presence through the Uniform Act even if

45

the witnesses' location was not known until two or three days before the trial commenced, a reasonable interpretation of the colloquy between the Court and the prosecutor is that both the judge and the prosecutor agreed that it could not be accomplished either in that time span or within two additional days after the commencement of trial.  Although the duty to make a good faith effort may in some circumstances include an obligation to resort to the Uniform Act, this duty arises only when the prosecution knows the location of the witness.  Ohio v. Roberts, 448 U.S. at 75-77; Dres v. Campoy, 784 F.2d 996, 999 (9th Cir. 1986).  Where a witness disappears, the prosecution has only a good faith obligation to find the witness.  Dres v. Campoy, 784 F.2d at 999.

Petitioner argues that it was insufficient to serve the witnesses with unenforceable subpoenas from California in light of their lack of cooperation during the first trial.  However, the witnesses responded after being served by contacting the prosecution, agreeing to cooperate, providing information to facilitate travel to the trial and back to Nevada, and agreeing to be taken to the site of the trial for the purpose of testifying.  It is recognized that a prosecutor may make a reasonable tactical decision not to serve a reluctant witness with a subpoena in order to maximize the likelihood that the witness will testify.  Dres v. Campoy, 784 F.2d at 1000.  In Dres v. Campoy, the prosecutor's reliance on the informal promise of the witness's mother to bring the witness to testify was considered reasonable because the prosecutor had no reason to suspect that the mother's promise would be ineffective to secure the witness's testimony, and the prosecutor had made every

46

reasonable effort to find the witness after she disappeared.   Id.
at 1001.   In the present case, the witnesses had both
affirmatively cooperated with the prosecution while they were in
Nevada, and one of the witnesses had secured a local
identification card, which reasonably indicated an intention to
maintain a known presence in the area.   It was not unreasonable
for the prosecution to believe that the witnesses would follow
through and testify.

Petitioner argues that because the witnesses returned to
their motel many hours later on the night the search was
abandoned, the prosecution's efforts were unreasonable.   However,
in light of the unanticipated disappearance of the witnesses, it
was not unreasonable to conclude that it was unlikely that the
witnesses would return or would return soon.   The fact that more
could have been done did not necessarily make the efforts
undertaken unreasonable.

Further, in reviewing a state court's application of the
federal standard, a federal court cannot overturn the state
decision simply because the federal court identifies additional
steps that the prosecution might have taken; rather, a state
court's application of the federal standard must merely be
reasonable.   Hardy v. Cross, 132 S.Ct. at 494.

In summary, the state court decision finding the witnesses
to have been unavailable was not an unreasonable application of
clearly established federal law even though the prosecution's
efforts did not succeed in procuring the testimony of Krystal and
Cassidy.   It is undisputed that Petitioner had a prior
opportunity to cross-examine the witness.   Accordingly, the Court

concludes that Petitioner has not shown that the state court's decision concerning the unavailability of the witnesses and the absence of a violation of the rights to confront and cross-examine witnesses was contrary to, or an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1).

Accordingly, it will be recommended that the claim be denied.

VII.   <u>Instructing the Jury with CALCRIM Number 319</u>

Petitioner argues that the trial court's error in giving a modified version of CALCRIM 319 interfered with Petitioner's right under the Sixth and Fourteenth Amendments to confront and cross-examine witnesses, severely undercut his right to present his defense, tended to lighten the prosecution's burden of proof in violation of the Due Process Clause, and implicated the Compulsory Process Clause of the Sixth Amendment.

A.   <u>The State Court's Decision</u>

The decision of the CCA on this issue is as follows:

**II. CALCRIM FN11 No. 319.**

> FN11. Judicial Council of California Criminal Jury Instructions (2007-2008) (CALCRIM).

David next contends the jury was improperly instructed with CALCRIM No. 319, prior statements of unavailable witnesses, because the instruction only allowed the jury to consider the prior out-of-court and inconsistent statements of Krystal and Cassidy for purposes of impeachment rather than for the truth of the matter.

**A. Background.**

During the instructional conference, Mr. Newkirk, the prosecutor, suggested that CALCRIM No. 319, prior statements of unavailable witness, should be given because there was testimony about the prior

48

out-of-court statements made by Krystal and Cassidy to various law enforcement officers. The pattern instruction states:

> "_____ <Insert name of unavailable witness> did not testify in this trial, but (his/her) testimony, taken at another time, was (read/played) for you. In addition to this testimony, you have heard evidence that _____ <insert name of unavailable witness> made (another/other) statement[s]. [I am referring to the statement[s] about which _____ insert name[s]> testified.]

> "If you conclude that _____ <insert name of unavailable witnesses> made (that/those) other statement[s], you may only consider (it/them) in a limited way. You may only use (it/them) in deciding whether to believe the testimony of _____ <insert name of unavailable witness> that was (read/played) here at trial. *You may not use (that/those) other statement[s] as proof that the information contained in (it/them) is true, nor may you use (it/them) for any other reason."* (CALCRIM No. 319, italics added .)

The court and parties agreed the instruction applied to both Krystal and Cassidy since there was evidence about out-of-court statements made by both of them to law enforcement officers. The court read the rest of the pattern instruction and focused on the last line, as italicized *ante*, as to whether the out-of-court statements could be used for the truth of the matter, and discussed the matter with Mr. Angermiller, David's attorney:

> "THE COURT: ... You may not use those other statements as proof of the information contained in them, nor may you use them for any other reason.

> "MR. ANGERMILLER: You know, that's kind of a-

> "MR. NEWKIRK: It's odd that they throw in that last sentence.

> "THE COURT: Very odd, because you actually can, can't you, in some cases?

> "MR. ANGERMILLER: Well, if they were sitting here testifying, you sure as heck could.

> "THE COURT: So, why can't you when you don't-

"MR. ANGERMILLER: Yeah.

"MR. NEWKIRK: Well, you can only use it if you cross-examine them and they denied it. [¶] And I can't remember whether you cross-examined them on [Deputy] Halencak's or-

"THE COURT: I think [defense counsel], didn't you when you were cross-examining them in the last trial?

"MR. ANGERMILLER: I think I did, yeah. [¶] Basically asked them, 'Isn't it true that you lied to the officers? And isn't it true that you told them that it was-the guy's name was Justin and he picked you up at the bowling alley,' and all that stuff.

"THE COURT: Right. So maybe we ought to take that last paragraph out.

"MR. NEWKIRK: *Not the paragraph, just the last sentence*." (Italics added.)

The court asked Mr. Angermiller if he agreed, and he said yes. The court again read the last sentence and remarked, "That's not the law," and Mr. Angermiller agreed.

"THE COURT: Yeah. All right. Let's take that out. I think you're right, I think if you read testimony and you didn't ask those questions prior, then you would have trouble now."

The court and the parties also agreed that CALCRIM No. 318 should be given.

Thereafter, the court instructed the jury with the following modified version of CALCRIM No. 319:

"Cassidy Coffey and Krystal Phillips did not testify in this trial, but their testimony taken at another time was read to you. In addition to this testimony, you have heard evidence that they made other statements. I am referring to statements about which deputies testified. *If you conclude they made those other statements, you may only consider them in a limited way. You may only use them in deciding whether to believe the testimony of Cassidy Coffey and Krystal Phillips that was read here at trial.*" (Italics added.)

The court next gave CALCRIM No. 318, prior statements as evidence:

> "You have heard evidence of statements ... a witness made before the trial. If you decide that a witness made those statements, you may use those statements in two ways: One, to evaluate whether the witness's testimony in court is believable, and two, *as evidence that the information in those earlier statements is true."* (Italics added.)

**B. Analysis.**

David contends the instructions prevented the jury from relying upon the out-of-court statements made by Krystal and Cassidy for the truth of the matter. While the court deleted the last sentence of the pattern instruction for CALCRIM No. 319, David notes the court left in language in the last paragraph (italicized *ante*) which stated that out-of-court statements could only be used to determine the credibility of Krystal and Cassidy. David acknowledges the jury also received CALCRIM No. 318, which specifically stated that it could consider prior out-of-court statements for either the truth of the matter or for impeachment. However, he argues the impact of CALCRIM No. 318 was undermined by the italicized language in CALCRIM No. 319, and the error was prejudicial because it prevented the jury from relying upon the witnesses' statements to the deputies for the truth as to what happened at the trailer.

David acknowledges he did not raise this objection at trial; indeed, he agreed to the court's modification of CALCRIM No. 319. Nevertheless, he contends this court may review the issue because the alleged instructional error violated his substantial rights. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1138.) He also contends this instructional error further illustrates the prejudicial impact that resulted when the court permitted the introduction of the former testimony of Krystal and Cassidy, because the instructions only allowed the jury to consider their former testimony for the truth of the matter, and their prior out-of-court statements for credibility purposes.

CALCRIM No. 319 contains language formerly stated in CALJIC No. 2.13, consideration of prior inconsistent statements. (*People v. Friend* (2009) 47 Cal.4th 1, 42, fn. 23.) CALCRIM No. 318 contains language formerly stated in CALJIC No. 2.12, consideration of the transcript testimony of an unavailable witness.

Respondent acknowledges the court and the parties

intended to permit the jury to consider the witnesses'
prior out-of-court statements for the truth of the
matter, which is why the court deleted the last line in
the pattern version of CALCRIM No. 319, but the court
mistakenly failed to modify the rest of the instruction.
Respondent further acknowledges there is some ambiguity
between CALCRIM Nos. 318 and 319 but argues the jury
was not misled and the error is not prejudicial.

An analogous instructional situation occurred in *People
v. Gutierrez* (2002) 28 Cal.4th 1083, where the police
obtained statements from the defendant in violation of
Miranda.FN12 The court held the defendant's
out-of-court statements were inadmissible in the
prosecution's case-in-chief because of the *Miranda*
violation but could be used to impeach his trial
testimony. *(Gutierrez*, at pp. 1130-1133.) The jury
received CALJIC No. 2.13, that it could consider prior
inconsistent statements for both the truth of the
matter and impeachment. On appeal, the defendant argued
the jury could have improperly relied on the
instruction to consider his out-of-court statements for
the truth of the matter, even though the statements
obtained in violation of *Miranda* were only admissible
to impeach his trial testimony. *(Gutierrez*, at p.
1134.) *Gutierrez* rejected the argument: "The short
answer is that a limiting admonition was never
requested, nor was the trial court under a sua sponte
obligation to give one. [Citations.] In any event,
since the [defendant's out-of-court] statement was
neither a confession nor an admission and defendant
concedes the statement was not true, there was no
substantive, much less prejudicial, use to which the
jury could have put the statement, even had the jury
improperly applied CALJIC No. 2 .13." (*Ibid.*)

> FN12. *Miranda v. Arizona* (1966) 384 U.S. 436
> (*Miranda*)

A similar situation exists in the instant case. While
CALCRIM Nos. 318 and 319, read together, are somewhat
ambiguous as to the consideration of a witness's prior
out-of-court statements, the instructional error was
not prejudicial under the unique circumstances of this
case. Both the prosecution and the defense called
deputies to testify about the out-of-court statements
made by Krystal and Cassidy shortly after they were
taken into custody at the trailer. In these statements,
however, Krystal and Cassidy repeatedly claimed they
did not know what happened at the trailer, they did not
see anything, and they did not know the identities of
the gunman or the victim. They did not give a different
narrative account of the homicide, or identify other
people as being involved. They simply claimed that they
had no idea what happened. Indeed, when the jury herein

heard their former testimony from the first trial, both
Krystal and Cassidy admitted that they lied to the
police when they were initially questioned about the
homicide, and Krystal continued to insist that she did
not see the gunman. As in *Gutierrez*, their prior
out-of-court statements were not substantive and they
even admitted their prior statements were not truthful.
The ambiguity between the instructions was not
prejudicial.

(LD 1, 44-48.)

## B.   Jury Instruction Error

When a conviction is challenged in a proceeding pursuant to
28 U.S.C. § 2254 on the basis of error in jury instructions, a
district court's review is informed by two clearly established
legal principles.

First, the United States Supreme Court has held that a
challenge to a jury instruction solely as an error under state
law does not state a claim cognizable in federal habeas corpus
proceedings. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). A
claim that an instruction was deficient in comparison to a state
model or that a trial judge incorrectly interpreted or applied
state law governing jury instructions does not entitle one to
relief under § 2254, which requires violation of the
Constitution, laws, or treaties of the United States. 28 U.S.C.
§§ 2254(a), 2241(c)(3).

Secondly, the only basis for federal collateral relief for
instructional error is that the infirm instruction or the lack of
instruction by itself so infected the entire trial that the
resulting conviction violates due process. Estelle, 502 U.S. at
72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see, Donnelly v.
DeChristoforo, 416 U.S. 637, 643 (1974) (noting that it must be
established not merely that the instruction is undesirable,

1  erroneous or even "universally condemned," but that it violated

2  some right guaranteed to the defendant by the Fourteenth

3  Amendment).   Further, the instruction may not be judged in

4  artificial isolation, but must be considered in the context of

5  the instructions as a whole and the trial record.  Estelle, 502

6  U.S. at 72.

7       In addition, in reviewing an ambiguous instruction, it must

8  be determined whether there is a reasonable likelihood that the

9  jury has applied the challenged instruction in a way that

10 violates the Constitution.  Estelle, 502 U.S. at 72-73

11 (reaffirming the standard as stated in Boyde v. California, 494

12 U.S. 370, 380 (1990)).  The Court in Estelle emphasized that the

13 Court had defined the category of infractions that violate

14 fundamental fairness very narrowly, and that beyond the specific

15 guarantees enumerated in the Bill of Rights, the Due Process

16 Clause has limited operation.  Id. at 72-73.

17      Moreover, even if there is instructional error, a petitioner

18 is generally not entitled to habeas relief for such error unless

19 it is prejudicial.  The Supreme Court has held that harmless

20 error analysis applies to instructional errors as long as the

21 error at issue does not categorically vitiate all the jury's

22 findings.  Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (citing

23 Neder v. United States, 527 U.S. 1, 11 (1999) (quoting in turn

24 Sullivan v. Louisiana, 508 U.S. 275 (1993) concerning erroneous

25 reasonable doubt instructions as constituting structural error)).

26 In Hedgpeth v. Pulido, the Court cited its previous decisions

27 that various forms of instructional error were trial errors

28 subject to harmless error analysis, including errors of omitting

54

or misstating an element of the offense or erroneously shifting

the burden as to an element.  Hedgpeth, 555 U.S. 60-61.

   Here, at the first trial, Petitioner's counsel had

questioned Cassidy and Krystal regarding their prior inconsistent

extrajudicial statements.  A fair reading of the record shows

that the parties and the trial court agreed that the jury should

not be limited to considering the statements only for impeachment

purposes; however, the modification of the instruction agreed to

by the parties retained language that limited consideration of

Cassidy's and Krystal's inconsistent extrajudicial statements to

impeachment purposes.  The other, more general instruction

concerning pretrial statements of witnesses permitted evaluation

for impeachment purposes as well as for the truth of the matter

asserted in the earlier statements.  Thus, the instructions were

at best ambiguous.  However, considering the specification of the

names of witnesses Krystal and Cassidy in CALCRIM 319, it is

reasonably likely that the jury applied the instruction to limit

its consideration of the two witnesses' extra-judicial statements

to impeachment purposes.  Thus, it is likely that as Petitioner

contends, the jury considered the former testimony for the truth

of the matter, but it could not consider the pretrial statements

for their truth or for any purpose other than impeachment.

### 1.   Right to Confrontation

   Petitioner has cited no United States Supreme Court case

that holds that the instructional error under consideration is

contrary to, or an unreasonable application of, clearly

established federal law within the meaning of § 2254(d)(1).  The

Confrontation Clause does not bar admission of a statement so

long as the declarant is present at trial to defend or explain

it.  Crawford v. Washington, 541 U.S. at 59 n.9 (citing

California v. Green, 399 U.S. 149, 162 (1970)).  The

Confrontation Clause does not bar the use of testimonial

statements for purposes other than establishing the truth of the

matters asserted.  Crawford v. Washington, 541 U.S. 36, 59 n.9

(2004) (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)).

The Court is aware of no case that holds that an instruction not

to consider a prior inconsistent statement for the truth of the

matter asserted is necessarily a violation of the Confrontation

Clause.  Thus, any finding that the Petitioner is entitled to

relief under § 2254(d)(1) would have to be based on United States

Supreme Court cases concerning more generally applicable

principles underlying the Confrontation Clause.

The main purpose of confrontation as guaranteed by the Sixth

Amendment is to secure the opportunity for cross-examination in

order to permit the opponent of the party presenting a witness to

test the believability of the witness and the truth of his or her

testimony by examining the witness's story, testing the witness's

perceptions and memory, and impeaching the witness.  Delaware v.

Van Arsdall, 475 U.S. 673, 678 (1986) (holding that the

Confrontation Clause was violated by prohibiting a party from

cross-examining to impeach the witness by showing bias); Davis v.

Alaska, 415 U.S. 308, 316 (1974) (holding that the Confrontation

Clause was violated by prohibiting a defendant from examining a

key prosecution witness to show that the witness was on probation

for juvenile delinquency and thus vulnerable and biased).  What

is guaranteed is the opportunity for effective cross-examination

1   subject to the wide discretion of the trial judge to impose

2   reasonable limits based on concerns about harassment, prejudice,

3   confusion of the issues, the safety of the witness, or avoidance

4   of repetitive and only marginally relevant interrogation.

5   Delaware v. Van Arsdall, 475 U.S. at 679.   Adequate cross-

6   examination entails not only the right to ask the witness about a

7   relevant topic, such as bias, but also the right to make a record

8   from which to argue concerning the topic.   Hayes v. Ayers, 632

9   F.3d 500, 518 (9th Cir. 2011) (concerning exclusion of privileged

10  evidence of a prosecution witness's desire for immunity for her

11  testimony).

12      It is recognized that a court violates the Confrontation

13  Clause when it prevents a defendant from any examination of a

14  particular and relevant topic, such as bias, but there is no

15  violation where the jury receives sufficient information to

16  appraise the issue.   Hayes v. Ayers, 632 F.3d at 518.

17  Restrictions on the right to confront adverse witnesses may not

18  be arbitrary or disproportionate to the purposes or legitimate

19  interests they are designed to serve.   Michigan v. Lucas, 500

20  U.S. 145, 151 (1991); Fenenbock v. Director of Corrections for

21  California, 692 F.3d 910, 920 (9th Cir. 2012).

22      Here, the prior inconsistent statements of two important

23  prosecution witnesses concerning the charged criminal conduct

24  were relevant matters.   The record reflects that during their

25  prior testimony, Krystal and Cassidy were extensively cross-

26  examined concerning not only their drug use, criminal histories,

27  and having been held as material witnesses, but also their

28  inconsistent statements, including whether and to what extent

they lied in the prior statements, why they lied, and the

conversations they had with each other with respect to the prior

statements.  (9 RT 1857-58, 1883-86, 1888, 1891-92, 1895-97,

1917, 1924-27, 1930, 1936, 1941, 1954, 1956-58, 1960, 1963-64,

1966, 1972-73.)

It is reasonably likely that jurors following the

instructions as given would have considered all these matters in

order to determine whether the witnesses were credible.  The

jurors would consider whether the fact that the witnesses

previously claimed not to have seen the shooting and not to have

known the shooter and/or the victim[2] warranted disbelief of the

---

[2] The matters asserted by Krystal Phillips in her statement made to
Tuolumne County Deputy Sheriff Spencer Garrett during a cursory interview to
ascertain the identity of the victim and the perpetrator an hour or two after
Krystal's detention at the property were that after arriving with John in the
truck, she heard yelling and five to ten shots; she did not see much because
she was hiding behind another vehicle and kept her head down.  She saw a man
with a black shirt and pants but saw no weapon; she had Millard call 9-1-1,
and she admitted she was on parole.  (12 RT 2222-27.)  Thus, the substance of
Krystal's statement was that John was the victim, she saw an unidentified man
in black clothing, and although she heard voices and shooting in a pattern
consistent with other reports ultimately reflected in the record, she did not
see much else.
    Cassidy Coffee made a statement when interviewed for two to three
minutes during her detention at the scene by Corporal Kelly Dickson of the
Tuolumne County Sheriff's Office.  The matters asserted in the statement were
that Cassidy got a ride with a man who engaged in a confrontation with
another, she hid under a truck, and a subject was shot.  She gave no names,
and she was very emotional and uncooperative, clearly indicating that she was
not a snitch and did not want to talk with law enforcement.  (12 RT 2229-35.)
Cassidy made another statement at the property to Corporal Philip Allen
Halencak of the Tuolumne County Sheriff's Office, who reported that when law
enforcement officers arrived at the scene, Cassidy and Krystal were reluctant
to get down on the ground to be cuffed and were cursing angrily.  The matters
asserted in the statement were that she and Krystal encountered Justin at a
bowling alley in Sonora and anticipated being taken to a casino.  They arrived
at the property, Justin walked to the trailer, Cassidy heard four shots, she
hid under a pickup, and then she heard four more shots that sounded as if the
shooter were walking; then the pickup left, and another vehicle later
followed.  She saw nothing else.  She refused to give any names or further
information and stated that she did not want to be known as a rat.  She
affirmatively misidentified the victim as Justin, and she consistently said
she could not see because her view was blocked by vehicles.  (8 RT 1737-47.)
Thus, the substance of her statements was that she saw nothing but heard shots
consistent with later reports ultimately reflected in the record; she refused
to identify the participants and gave a false name for the victim; and she did
not want to be known as a rat.

witnesses' inconsistent trial testimony that they saw substantial portions of the shooting and knew the victim or perpetrator.  If the jurors concluded that the witnesses' earlier statements indicated that the witnesses' inconsistent trial testimony was not worthy of belief, then the inability of the jurors to proceed further to consider the prior statements for their truth would be without any prejudicial effect to the Petitioner; discounting trial testimony because of an absence of credibility would not differ from discounting trial testimony after considering the prior statements for the truth of their substance and resolving any conflict in the Petitioner's favor.  It does not appear that the truth-finding function of cross-examination was compromised. In the unique circumstances of this case, the jury was not foreclosed from considering any subject relevant to the issues, including the credibility of important prosecution witnesses, and the jury already was given multiple sources of evidence concerning the shooting and the identity of the perpetrator and the victim.

The state court's decision was based on an analysis of the prejudice suffered by Petitioner by the instructional error.  The

---

In summary, in the pretrial statements, Krystal identified the victim but denied being able to identify the other party; Cassidy gave inconsistent information concerning the events leading up to her arrival at the property and regarding the identity of the victim, and she did not identify the shooter; and both witnesses denied having seen a weapon or the actual shooting.  This contrasted with their trial testimony, in which the witnesses admitted having arrived with John to talk with Shawna about David and represented that they observed the confrontation between John and Shawna and the shooting, although Krystal maintained that she did not see the gunman's face.  The few details concerning the confrontation and the shooting that were given in the pretrial statements were generally consistent with the expanded version of the events that the witnesses testified to at trial.  The differences related to the witnesses' opportunity to perceive and recollect the pertinent facts and the resultant extent of their knowledge, and not to the chronology of the events of the homicide.

reliance on prejudice was consistent with clearly established federal law.  The instructional error here did not categorically vitiate all the jury's findings; rather, it affected primarily the jury's assessment of the former testimony of Krystal and Cassidy.  Further, the state court correctly reasoned that an absence of prejudice warranted a denial of relief.  The state court thus reasonably determined that in the circumstances of this case, there was no prejudicial effect from the state law error.

## 2.  Right to Present a Defense

Petitioner argues generally that his right to present a defense was severely undercut.

Although state and federal authorities have broad latitude to establish rules excluding evidence from criminal trials, the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment guarantee a criminal defendant a meaningful opportunity to present a complete defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  It is a fundamental element of due process of law that a defendant has a right to present a defense by compelling the attendance and presenting the testimony of witnesses.  Washington v. Texas, 388 U.S. 14, 18-19, 23 (1967).  However, a defendant does not have an absolute right to present evidence without reference to its significance or source; rather, the right to present a complete defense is implicated when the evidence the defendant seeks to admit is relevant, material, and vital to the defense.  Washington v. Texas, 388 U.S. at 16.  Further, the exclusion of the evidence must not be arbitrary or

1   disproportionate to the purposes the exclusionary rule is

2   designed to serve.  Holmes v. South Carolina, 547 U.S. 319, 324-

3   25 (2006).  If the mechanical application of a rule that is

4   respected, frequently applied, and otherwise constitutional would

5   defeat the ends of justice, then the rule must yield to those

6   ends.  Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

7       Where exclusion of evidence violates a petitioner's right to

8   present a defense, habeas relief is the appropriate remedy only

9   if the constitutional violation resulted in error that was not

10  harmless, that is, error that resulted in actual prejudice, or

11  had a substantial and injurious effect or influence in

12  determining the jury's verdict.  Jackson v. Nevada, 688 F.3d

13  1091, 1104 (9th Cir. 2012), pet. for cert. filed 81 USLW 3349

14  (No. 12-694 Dec. 3, 2012) (citing Fry v. Pliler, 551 U.S. 112,

15  121-22 (2007) and Brecht v. Abrahamson, 507 U.S. 619, 637

16  (1993)).  To consider whether the Brecht standard has been met, a

17  court considers various factors, including but not limited to 1)

18  the importance of the witness's testimony in the prosecution's

19  case, 2) whether the testimony was cumulative, 3) the presence or

20  absence of evidence corroborating or contradicting the testimony

21  of the witness on material points, 4) the extent of cross-

22  examination otherwise permitted; and 5) the overall strength of

23  the prosecution's case.  Merolillo v. Yates, 663 F.3d 444, 455

24  (9th Cir. 2011) (citing Delaware v. Van Arsdall, 475 U.S. 673,

25  684 (1986)).

26      Here, Petitioner has not articulated how the jury

27  instruction error deprived him of his opportunity to present a

28  defense.  As previously noted, even under the conflicting

61

1    instructions, the jury considered the prior extrajudicial

2    statements in determining the credibility of the witnesses

3    without any apparent prejudice resulting to Petitioner.  Although

4    Krystal and Cassidy were important witnesses, there was

5    considerable additional evidence that corroborated their

6    testimony regarding the events of the shooting and the identity

7    of the perpetrator, including Millard's testimony, physical and

8    forensic evidence, and the testimony of law enforcement officers

9    and experts regarding their observations and physical and

10   forensic evidence.  The witnesses were fully cross-examined.  The

11   prosecution's case was strong.

12       The Court thus concludes that Petitioner has not shown that

13   any diminution of his defense resulted in any prejudice.

14   Petitioner has not shown that the state court decision was

15   contrary to, or an unreasonable application of, clearly

16   established federal law concerning the right to present a

17   defense.

18                    3.  <u>Burden of Proof</u>

19       Petitioner argues generally that the error lightened the

20   prosecution's burden of proof.  Petitioner does not explain how

21   this is so.  It may be that Petitioner is arguing that the

22   failure to have the jury consider the extrajudicial statements

23   for the truth of the matters asserted made it easier for the

24   prosecution to prove that Petitioner committed the murder.

25       In a criminal trial, the State must prove every element of

26   the offense, and a jury instruction violates due process if it

27   fails to give effect to that requirement.  <u>See</u>, <u>Sandstrom v.</u>

28   <u>Montana</u>, 442 U.S. 510, 520-521 (1979).  However, not every

                                62

1  ambiguity, inconsistency, or deficiency in a jury instruction

2  rises to the level of a due process violation.  The question is

3  rather whether the ailing instruction so infected the entire

4  trial that the resulting conviction violates due process.

5  Middleton v. McNeil, 541 U.S. 433, 437 (2004).

6      The trial court instructed the jury that it was to pay

7  careful attention to all the instructions and to consider them

8  together.  The judge instructed the jury that the jury must

9  decide what the facts are; some of the instructions might not

10 apply, depending on the jury's findings about the facts of the

11 case, and the jury was not to assume just because the court gave

12 a particular instruction that it was suggesting anything about

13 the facts, but rather was to follow the instructions that applied

14 to the facts after the jury had decided what the facts were.  The

15 jury was to compare and consider impartially all the evidence

16 received throughout the entire trial, and to judge the testimony

17 of each witness by the same standard.  (13 RT 2533-34, 2539.)

18 The court instructed the jury that the Petitioner was presumed to

19 be innocent and that the People were required to prove guilt

20 beyond a reasonable doubt.  (Id. at 2535.)

21      As previously noted, the jury considered the pretrial

22 statements in determining whether to find Krystal's and Cassidy's

23 testimony believable, so the jurors were presented with the

24 witnesses' denials of knowledge of the events of the shooting.

25 The jurors necessarily determined whether and to what extent to

26 believe the witnesses concerning their observations at the scene.

27 Petitioner has not shown how the instruction in the circumstances

28 of the present case resulted in any actual prejudice to

Petitioner or otherwise rendered the trial unfair.

In summary, the Court concludes that Petitioner has not shown that the state court decision was contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, it will be recommended that Petitioner's claim concerning CALCRIM number 319 be denied.

VIII.  Instructing the Jury pursuant to CALCRIM Number 361[3]

Petitioner argues that instructing the jury pursuant to CALCRIM number 361 violated his rights to due process of law and to be convicted only upon proof beyond a reasonable doubt.

A.  The State Court's Decision

The pertinent portion of the decision of the CCA is as follows:

**III. CALCRIM No. 3.61.**

David testified at the second trial, and contends the jury was improperly instructed with CALCRIM No. 3.61, the defendant's failure to explain or deny adverse testimony. He argues the instruction was not supported by substantial evidence, and it violated his constitutional rights to due process and to be convicted only upon proof beyond a reasonable doubt.FN13

FN13. David did not raise any of these objections at trial but again claims the instruction violated his substantial rights. (*Guerra, supra*, 37 Cal.4th 1067, 1138.)

The court instructed the jury with CALCRIM No. 361:

"If a defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so, based on what he knew, you may consider this failure to explain or deny in evaluating that evidence. Any such failure is not enough, by itself, to prove guilt. [¶] The

---

[3] The state court decision identifies the instruction as both "3.61" and "361," but it appears most often as "361." (See, e.g., LD 1 at 48-49.)

People must still prove each element of the
crime beyond a reasonable doubt. If the
defendant failed to explain or deny, it is up
to you to decide the meaning and importance
of that failure."

CALCRIM No. 361 is similar in content to CALJIC No.
2.62, and serves the important function of conveying to
the jury the "well settled rule that a defendant who
takes the stand and testifies in his behalf waives his
Fifth Amendment privilege [citation] and his state
constitutional privilege to the extent of the scope of
relevant cross-examination.' *(People v. Saddler* (1979)
24 Cal.3d 671, 679 *(Saddler)*; *People v. Rodriguez*
(2009) 170 Cal.App.4th 1062, 1066 *(Rodriguez)*.) As with
CALJIC No. 2.62, CALCRIM No. 361 suffers no
constitutional or other infirmities and may be given in
the appropriate case. (*Saddler, supra*, 24 Cal.3d at p.
681; *Rodriguez, supra*, 170 Cal.App.4th 1062,
1066-1068.)

Whether CALCRIM No. 361 should be given depends on the
specific facts of the case. (*People v. Mask* (1986) 188
Cal.App.3d 450, 455 *(Mask)*.) CALCRIM No. 361 should
only be given when there are acts or evidence in the
prosecution's case within the defendant's knowledge
which he did not explain or deny. (*Saddler, supra*, 24
Cal.3d at pp. 682-683; *Rodriguez, supra*, 170
Cal.App.4th at pp. 1066-1067.) "[A] contradiction is
not a failure to explain or deny." (*Saddler, supra*, 24
Cal.3d at p. 682.) "If he fully accounts for his
whereabouts and denies the crime, the mere fact that
defendant's story is contradicted by other prosecution
evidence does not pave the way for giving the
instruction, because contradiction is not by itself a
failure to explain or deny. [Citations.]" (*Mask, supra*,
188 Cal.App.3d at p. 455.)

However, if the defendant elects to testify at trial
and there are "logical gaps" in his testimony, the
instruction should be given to the jury. (*People v.
Redmond* (1981) 29 Cal.3d 904, 911.) Moreover, the
instruction should be given "if the defendant tenders
an explanation which, while superficially accounting
for his activities, nevertheless seems bizarre or
implausible, the inquiry whether he reasonably should
have known about circumstances claimed to be outside
his knowledge is a credibility question for resolution
by the jury [citations]." (*Mask, supra,* 188 Cal.App.3d
at p. 455; *People v. Belmontes* (1988) 45 Cal.3d 744,
784, disapproved on other grounds in *People v. Doolin*
(2009) 45 Cal.4th 390, 421; *People v. Sanchez* (1994) 24
Cal.App.4th 1012, 1030.)

David argues there was no evidentiary basis to give

CALCRIM No. 361 because he was cross-examined about every aspect of the case, and "[a]t no time did [he] fail to answer the prosecutor's questions. To every question he made his best effort to answer." As respondent points out, the record refutes this assertion on several points where facts were uniquely within David's knowledge, but there were logical gaps in his account and he offered implausible explanations for critical incidents.

For example, the prosecution's evidence established that Flaherty fell into the culvert after he was shot and David kept shooting. Millard heard shots, saw someone fall down and heard more shots, and there was blood and drag marks in the culvert. David testified on direct examination that he fired two volleys of shots at Flaherty, and kept firing because he thought Flaherty was turning to retrieve his own weapon from his truck. On cross-examination, the prosecutor asked David to explain how Flaherty ran toward him, and Flaherty's location and actions as David shot him. David testified he did not know how Flaherty was standing, where his hands were and when he turned, and whether he kept shooting after Flaherty fell. David admitted he did not know when he shot Flaherty in the head, and he was not sure about the details of Flaherty's movements or when he fell. David was simply unable to explain the critical sequence of Flaherty's location as he kept firing.

The prosecution's evidence also established that someone who remained in the truck as it went over the cliff, or jumped out of the truck and bounced down the rocks to the bottom of the canyon, would have suffered severe or even fatal injuries, and that David's scratches and bruises were inconsistent with staying in the truck or bouncing down the rocks. David testified on direct examination that he stayed in the truck as it went over the cliff, jumped out, and bounced down the rocks to the bottom of the canyon. On cross-examination, the prosecutor asked David to clarify how fast the truck was going and the exact point he drove over the cliff. David testified he could not be specific about those details. The prosecutor asked whether his scratches were the worst injuries he suffered falling down the 300 to 400 foot cliff at a 45 degree angle. David insisted he was wearing pants.

"Q You weren't in an Evil Knievel bodysuit or anything like that?

"A No.

"Q You didn't have a helmet on?

"A No.

"Q And there's no injuries on your hands, correct?

"A I don't remember.

"Q Did you hold your hands up so you wouldn't put them down to get them injured?

"A No.

"Q You were trying to stop yourself with your hands, correct?

"A Yeah. There's a lot of grass.

"Q There's a lot of grass like on Exhibit No. 102 where there's about a 40-foot cliff that's solid rock?

"A Well, up until that point.

"Q So you didn't use your hands going down the cliff part, the rocky part?

"A No.

"Q You kept them up somehow?

"A I don't know. I grabbed-I grabbed for rocks and stuff, but it didn't ... no, my hands didn't get all cut up."

The court properly gave CALCRIM No. 361 given these aspects of David's cross-examination testimony.

(LD 1, 48-52.)

   B.   Analysis

   Petitioner argues that instructing the jury with CALCRIM 361 infringed upon his right to due process of law because it 1) applied only to Petitioner and thus was applied unevenly to the Petitioner; 2) violated the requirement of absolute impartiality between defense and prosecution with regard to jury instructions and 3) unfairly lightened the prosecution's burden of proof and thereby infringed Petitioner's Sixth Amendment right to a fair jury trial as well as his right to due process of law.

Preliminarily, it appears that the state court reasonably determined that there was evidence warranting the giving of the instruction. Accepting the state court's interpretation of state law, the instruction is warranted where even though a testifying defendant has offered an explanation, the explanation contains logical gaps or is "bizarre or implausible." (LD 1 at 50 (citing state cases).) Petitioner was unable to explain key aspects of the shooting that appear to have been within his knowledge, including how the victim ran towards him and the victim's location and conduct when Petitioner was shooting him. (LD 1 at 51.) Further, although Petitioner explained his own descent over the cliff, his explanation was reasonably considered to have been implausible because it did not explain how Petitioner suffered only scratches and bruises, but no cuts on his hands, from jumping out of the truck and bouncing down the rocks of a 300 to 400 foot cliff at a forty-five degree angle to the bottom of the canyon or from remaining in the truck for the entire descent. (Id.)

With respect to the right to a fair trial, Petitioner has not shown that the state court decision was contrary to, or an unreasonable application of, clearly established federal law within the meaning of § 2254(d)(1). Petitioner has not identified a United States Supreme Court decision finding that a state violates a defendant's due process right to a fair trial by allowing the jury to draw an adverse inference from a testifying defendant's failure to explain or refute evidence when he can be reasonably expected to do so. In Caminetti v. United States, 242 U.S. 476, 494 (1917), the Court addressed a similar instruction

and associated commentary in a case involving prosecution for

transportation of females for immoral purposes:

> In the Diggs Case, after referring to the fact that the
> defendant had taken the stand in his own behalf, and
> that his testimony differed somewhat from that of the
> girls who had testified in the case, and instructing
> the jury that it was their province to ascertain the
> truth of the matter, the court further said: 'After
> testifying to the relations between himself and
> Caminetti and these girls down to the Sunday night on
> which the evidence of the government tends to show the
> trip to Reno was taken, he stops short and has given
> none of the details or incidents of that trip nor any
> direct statement of the intent or purpose with which
> that trip was taken, contenting himself by merely
> referring to it as having been taken, and by testifying
> to his state of mind for some days previous to the
> taking of that trip. Now this was the defendant's
> privilege, and, being a defendant, he could not be
> required to say more if he did not desire to do so; nor
> could he be cross-examined as to matters not covered by
> his direct testimony. But in passing upon the evidence
> in the case for the purpose of finding the facts you
> have a right to take this omission of the defendant
> into consideration. A defendant is not required under
> the law to take the witness stand. He cannot be
> compelled to testify at all, and if he fails to do so,
> no inference unfavorable to him may be drawn from that
> fact, nor is the prosecution permitted in that case to
> comment unfavorably upon the defendant's silence; but
> where a defendant elects to go upon the witness stand
> and testify, he then subjects himself to the same rule
> as that applying to any other witness, and if he has
> failed to deny or explain acts of an incriminating
> nature that the evidence of the prosecution tends to
> establish against him, such failure may not only be
> commented upon, but may be considered by the jury with
> all the other circumstances in reaching their
> conclusion as to his guilt or innocence; since it is a
> legitimate inference that, could he have truthfully
> denied or explained the incriminating evidence against
> him, he would have done so.'

<u>Caminetti v. United States</u>, 242 U.S. at 492-93.  The Court held

that there was no violation of the defendant's Fifth Amendment

privilege not to testify, reasoning that the better reasoned view

was that where an accused takes the stand in his own behalf and

voluntarily testifies for himself, he may not "stop short in his

testimony by omitting and failing to explain incriminating

circumstances and events already in evidence, in which he

participated and concerning which he is fully informed, without

subjecting his silence to the inferences to be naturally drawn

from it." Id. at 494.  The Court concluded as follows:

> The accused, of all persons, had it within his power to
> meet, by his own account of the facts, the
> incriminating testimony of the girls. When he took the
> witness stand in his own behalf he voluntarily
> relinquished his privilege of silence, and ought not to
> be heard to speak alone of those things deemed to be
> for his interest, and be silent where he or his counsel
> regarded it for his interest to remain so, without the
> fair inference which would naturally spring from his
> speaking only of those things which would exculpate him
> and refraining to speak upon matters within his
> knowledge which might incriminate him. The instruction
> to the jury concerning the failure of the accused to
> explain acts of an incriminating nature which the
> evidence for the prosecution tended to establish
> against him, and the inference to be drawn from his
> silence, must be read in connection with the statement
> made in this part of the charge which clearly shows
> that the court was speaking with reference to the
> defendant's silence as to the trip to Reno with the
> girls named in the indictment, and as to the facts,
> circumstances, and intent with which that trip was
> taken; and the jury was told that it had a right to
> take into consideration that omission.
>
> The court did not put upon the defendant the burden of
> explaining every inculpatory fact shown or claimed to
> be established by the prosecution. The inference was to
> be drawn from the failure of the accused to meet
> evidence as to these matters within his own knowledge
> and as to events in which he was an active participant
> and fully able to speak when he voluntarily took the
> stand in his own behalf. We agree with the circuit
> court of appeals that it was the privilege of the trial
> court to call the attention of the jury in such manner
> as it did to this omission of the accused when he took
> the stand in his own behalf.

Id. at 494-495.

Further, the Supreme Court's decisions do not indicate that

the pertinent instruction violates due process by creating a

presumption or diluting the burden of proof.  In Adamson v.

People of the State of California, 332 U.S. 46 (1947), a
defendant challenged a state law that permitted the court and
counsel to comment on the failure of a testifying defendant to
explain or deny by his testimony any evidence or fact in the case
against him.  Adamson was decided before the Court held in Malloy
v. Hogan, 378 U.S. 1, 6 (1964) that the Fifth Amendment privilege
against compulsory self-incrimination was made binding on the
states by the Fourteenth Amendment.  Nevertheless, the Court in
Adamson examined whether the instruction involved compulsion and
thereby violated the defendant's right to a fair trial that is
guaranteed under the Due Process Clause of the Fourteenth
Amendment.  (Id. at 50-55.)  The Court concluded that the state
law permitting comment by the court and counsel upon the "failure
of the defendant to explain or to deny by his testimony and
evidence or facts in the case against him" did not involve any
presumption, rebuttable or irrebuttable, of either guilt or of
the truth of any fact offered in evidence; rather, it allowed
inferences to be drawn from proven facts.  Id. at 55-56.  The
Court noted that if the pertinent facts are beyond the
defendant's knowledge, any failure to testify would have little
if any weight, but if the facts are necessarily within the
knowledge of the accused, a failure to explain would point to an
inability to explain.  Id. at 56.  Because under state law the
failure to testify was not an admission of the truth of the
adverse evidence, and because other instructions informed the
jury that the burden of proof remained on the state and the
presumption of innocence remained with the accused, comment on
the failure to deny proven facts did not in California tend to

1   supply any missing element of proof of guilt; rather, it only

2   directed attention to the strength of the prosecution's evidence

3   or the weakness of that for the defense.   Id. at 58.

4       The same analysis may be undertaken in the present case with

5   the same result.  CALCRIM number 361 did not set forth any

6   presumption, but rather permitted the trier to draw inferences

7   from facts proved by evidence; it expressly noted that a failure

8   to explain or deny was not sufficient to prove guilt.  It and the

9   other instructions made it clear that the burden of proof

10  remained with the state, and the presumption of innocence applied

11  to the defendant.

12      These circumstances also distinguish the present case from

13  Speiser v.Randall, 357 U.S. 513 (1958), which Petitioner cites in

14  support of his argument that the instruction unfairly lightened

15  the prosecution's burden of proof, thus infringing on

16  Petitioner's Sixth Amendment right to a fair jury trial as well

17  as to due process of law.  In Speiser v. Randall, the Court in a

18  tax suit addressed a state law that placed the initial burden of

19  producing proof by declaration of the plaintiff's non-advocacy of

20  governmental overthrow (a condition to relief) on the taxpayer,

21  and which also placed the burden of proof on the taxpayer to

22  persuade the assessor or the court that he fell outside the class

23  that was denied a tax exemption.

24      Unlike the situation presented in Speiser, in the present

25  case the challenged instruction and additional instructions made

26  it clear to the jury that the burden of producing evidence and

27  the ultimate burden of persuasion rested with the prosecution.

28  Thus, this case is not analogous with Speiser v. Randall.

1   Petitioner argues that the instruction unfairly singled him

2   out for treatment that was not suffered by other witnesses, and

3   thus it was not reciprocal or impartial.  In support, Petitioner

4   cites numerous cases, including Green v. Georgia, 442 U.S. 95

5   (1979) (holding that exclusion of a witness's hearsay testimony

6   that a second defendant had confided to the witness that he had

7   killed the victim was a denial of a fair trial on the issue of

8   punishment, relying in part on the reliability of the hearsay as

9   shown by the prosecution's use of it to convict the co-

10  defendant); Webb v. Texas, 409 U.S. 95, 97-98 (1972) (holding

11  that where the sole defense witness was dissuaded from testifying

12  by the trial court's gratuitous singling the witness out for a

13  lengthy admonition on the dangers of perjury, warning the witness

14  of his right to refuse to testify and of the necessity to tell

15  the truth, and implying that the witness, who was a sentenced

16  prisoner with a criminal record, was expected to lie and would be

17  prosecuted for perjury, the accused's due process rights were

18  violated because it was likely that the judge's strong statements

19  exerted duress sufficient to preclude the witness's free and

20  voluntary choice whether or not to testify and thereby obstructed

21  the accused's right to present his own witnesses to establish a

22  defense); Reagan v. United States, 157 U.S. 301, 310 (1895)

23  (upholding in a prosecution for receiving smuggled cattle an

24  instruction that a witness with a direct and personal interest in

25  the result of a suit could be tempted to color, pervert, or

26  withhold facts, and that the deep, personal interest of the

27  testifying defendant should be considered by the jury in weighing

28  his testimony and determining how far, or to what extent, if at

73

all, it was worthy of credit because the defendant's interest was
a matter properly brought to the jury's attention, the court
first stated a general rule applicable to all circumstances and
then called attention to the defendant's deep personal interest,
and there was no intimation that the defendant had been
untruthful in his testimony); Wardius v. Oregon, 412 U.S. 470
(1973) (holding that due process prohibited enforcement of a
state law excluding alibi evidence unless the defendant gave
pretrial notice to the prosecution of the basic facts of the
defense, where no reciprocal duty was put on the prosecution to
disclose any evidence, including the state's alibi rebuttal
witnesses, and where there was no showing of a strong state
interest to the contrary, because although criminal discovery
does not necessarily violate the Due Process Clause, state trial
rules which provide nonreciprocal benefits to the state can
interfere with the defendant's ability to secure a fair trial,
especially where a defendant must divulge details of his case but
is subjected to surprise concerning refutation of the disclosed
evidence); and Washington v. Texas, 388 U.S. 14, 22 (1967)
(holding that a state law precluding principals, accomplices, or
accessories in the same crime from being witnesses for each
other, but which allowed them to testify for the state, violated
the defendant's Sixth Amendment right, made binding on the states
through the Fourteenth Amendment, to compulsory process to obtain
witnesses in his favor and to place on the stand a witness who
was physically and mentally capable of testifying to events that
he had personally observed and whose testimony would have been
relevant and material to the defense because the exclusion

arbitrarily barred an entire category of defense witnesses based
on a mere presumption that they were unworthy of belief).

The present case does not involve situations like those
presented in Green v. Georgia, 442 U.S. 95, and Washington v.
Texas, 388 U.S. 14 because in this case, Petitioner's testimony
was not barred, and no broad category of relevant and material
defense evidence was excluded from the trial; rather, the
instruction directed the jury to consider a potential factor in
the course of its credibility assessment. Petitioner's right to
a fair trial and his rights to compulsory process and to present
witnesses under the Sixth and Fourteenth Amendments were not
violated.

Further, the present case is unlike Webb v. Texas, 409 U.S.
95 because no defense witness was dissuaded from testifying, and
it was not implied that the Petitioner was lying or would be
subject to a prosecution for perjury; thus, Petitioner's rights
to testify and to present a defense were not impeded.

With respect to reciprocity, unlike Wardius v. Oregon, the
present case involved not a discovery provision, but rather a
jury instruction. Although the instruction did focus on the
defendant's testimony, it addressed a narrow aspect of
credibility assessment, namely, whether in the course of his
testimony, the defendant failed to explain or deny matters
reasonably expected to have been explained or denied. The
instruction did not preclude material defense evidence; rather,
it drew the fact finder's attention to the issue and informed the
jury that it was up to them to determine the meaning and
importance of any failure of the Petitioner's testimony to

explain or deny matters he could reasonably have been expected to explain or deny.  The present case is more analogous with <u>Reagan v. United States</u>, 157 U.S. at 310, in which a neutrally voiced instruction pointed out the credibility issue to the jury and entrusted the credibility determination to the jury without any suggestion that the defendant had been untruthful in his testimony.

In summary, the state court's decision on Petitioner's claim concerning CALCRIM 361 was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, it will be recommended that Petitioner's claim concerning CALCRIM 361 be denied.

IX.  <u>Certificate of Appealability</u>

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).  A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right.  § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336 (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether the petition states a

1  valid claim of the denial of a constitutional right or that

2  jurists of reason would find it debatable whether the district

3  court was correct in any procedural ruling.  Slack v. McDaniel,

4  529 U.S. 473, 483-84 (2000).

5       In determining this issue, a court conducts an overview of

6  the claims in the habeas petition, generally assesses their

7  merits, and determines whether the resolution was debatable among

8  jurists of reason or wrong.  Id.  It is necessary for an

9  applicant to show more than an absence of frivolity or the

10 existence of mere good faith; however, it is not necessary for an

11 applicant to show that the appeal will succeed.  Miller-El v.

12 Cockrell, 537 U.S. at 338.

13      A district court must issue or deny a certificate of

14 appealability when it enters a final order adverse to the

15 applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

16      Here, it does not appear that reasonable jurists could

17 debate whether the petition should have been resolved in a

18 different manner.  Petitioner has not made a substantial showing

19 of the denial of a constitutional right.

20      Accordingly, it will be recommended that the Court decline

21 to issue a certificate of appealability.

22      X.  Recommendation

23      Accordingly, it is RECOMMENDED that:

24      1) The petition for writ of habeas corpus be DENIED; and

25      2) The Clerk ENTER judgment for Respondent; and

26      3) The Court DECLINE to issue a certificate of

27 appealability.

28      These findings and recommendations are submitted to the

United States District Court Judge assigned to the case, pursuant
to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of
the Local Rules of Practice for the United States District Court,
Eastern District of California.  Within thirty (30) days after
being served with a copy, any party may file written objections
with the Court and serve a copy on all parties.  Such a document
should be captioned "Objections to Magistrate Judge's Findings
and Recommendations."  Replies to the objections shall be served
and filed within fourteen (14) days (plus three (3) days if
served by mail) after service of the objections.  The Court will
then review the Magistrate Judge's ruling pursuant to 28 U.S.C.
§ 636 (b)(1)(C).  The parties are advised that failure to file
objections within the specified time may waive the right to
appeal the District Court's order. Martinez v. Ylst, 951 F.2d
1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **March 1, 2013**          **/s/ Barbara A. McAuliffe**
                                     UNITED STATES MAGISTRATE JUDGE